## NATIONAL LABOR RELATIONS BOARD v. PENNSYLVANIA GREYHOUND LINES, INC., ET AL.

No. 413. Argued February 4, 1938.—Decided February 28, 1938.

*Mr. Charles Fahy,* with whom *Solicitor General Reed, Assistant Solicitor General Bell,* and *Messrs. Robert L. Stern, Robert B. Watts,* and *Laurence A. Knapp* were on the brief, for petitioner.

*Mr. Ivan Bowen,* with whom *Messrs. Charles H. Young* and *M. H. Boutelle* were on the brief, for respondents.

MR. JUSTICE STONE delivered the opinion of the Court.

The main question for decision is whether, upon a finding that an employer has created and fostered a labor organization of employees and dominated its administration in violation of § 8 (1), (2) of the National Labor Relations Act of July 5, 1935 (c. 372, 49 Stat. 449, 29 U. S. C., § 151, *et seq.*), the National Labor Relations Board, in addition to ordering the employer to cease these practices,

can require him to withdraw all recognition of the organization as the representative of his employees and to post notices informing them of such withdrawal.

Respondent Pennsylvania Greyhound Lines, Inc., is a corporation operating a passenger motor bus system between the Atlantic Coast and Chicago and St. Louis. Respondent Greyhound Management Company, an affiliate of the Pennsylvania Company, performs various services relating to employee personnel of the latter and its affiliated corporations. Together, respondents act as employers of those employees working at the Pittsburgh Garage of the Pennsylvania Company and together actively deal with labor relations of those employees.

Upon charges filed by Local Division No. 1063, Amalgamated Association of Street, Electric Railway and Motor Coach Employees of America, a labor organization, the Board issued its complaint, as permitted by § 10 (b) of the Act, charging that respondents had engaged in specified unfair labor practices affecting interstate commerce, in violation of § 8. After notice to respondents, and hearing, the Board found that they had engaged in unfair labor practices by interfering with, restraining, and coercing employees in the exercise of their rights, guaranteed by § 7, in that they had dominated and interfered with the formation and administration of a labor organization of their employees, Employees Association of the Pennsylvania Greyhound Lines, Inc., and had contributed financial and other support to it in violation of § 8 (1), (2).

The Board ordered that respondents cease each of the specified unfair labor practices. It further ordered that they withdraw recognition from the Employees Association as employee representative authorized to deal with respondents concerning grievances, terms of employment, and labor disputes, and that they post conspicuous notices in all the places of business where such employees are en-

gaged, stating that the "Association is so disestablished and that respondents will refrain from any such recognition thereof." 1 N. L. R. B. 1.

Upon the Board's petition under § 10 (e) to enforce the order, heard April 1, 1936, the Court of Appeals for the Third Circuit gave judgment after a delay of one year and two months, during which there were three postponements and two rearguments. It struck from the order all provisions requiring the withdrawal by respondents of recognition of the Employees Association and publication of notice of withdrawal, and directed that in other respects the Board's order be enforced. 91 F. (2d) 178. The court thought that the Board was without authority to order the employers to withhold recognition from the Association, without notice to it and opportunity for a hearing, and without an election by the employees to choose a labor organization to represent them. We granted certiorari, 302 U. S. 676, the questions involved being of importance in the administration of the National Labor Relations Act.

Respondents do not assail the Board's findings of fact as without support in the evidence, and the principal questions for decision are of law, whether in the circumstances disclosed by the findings the Board acted within the authority conferred upon it by §§ 7, 8 and 10 of the Act. Section 7 provides:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection."

Section 8 declares:

"It shall be an unfair labor practice for an employer—

"(1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7.

"(2) To dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it: . . ."

By § 10 (b) the Board is given authority to hear complaints of unfair labor practices upon evidence; and § 10 (c)[1] directs that when the Board finds that any person has engaged in unfair labor practices it "shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action . . . as will effectuate the policies of this Act. . . ."

Notwithstanding the mandatory form of § 10 (c), its provisions in substance leave to the Board some scope for the exercise of judgment and discretion in determining, upon the basis of the findings, whether the case is one requiring an affirmative order, and in choosing the particular affirmative relief to be ordered. Hence, upon the challenge of the affirmative part of an order of the Board, we look to the Act itself, read in the light of its history, to ascertain its policy, and to the facts which the Board has found, to see whether they afford a basis for its judgment that the action ordered is an appropriate means of carrying out that policy.

The history of the Act and its language show that its ruling purpose was to protect interstate commerce by

---

[1] "Sec. 10 (c). The testimony taken by such member, agent or agency or the Board shall be reduced to writing and filed with the Board. Thereafter, in its discretion, the Board upon notice may take further testimony or hear argument. If upon all the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action, including reinstatement of employees with or without back pay, as will effectuate the policies of this Act. . . ."

securing to employees the rights established by § 7 to organize, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for that and other purposes. *National Labor Relations Board* v. *Jones & Laughlin Steel Corp.,* 301 U. S. 1, 23, 33. This appears both from the formal declaration of policy in § 1 of the Act, *National Labor Relations Board* v. *Jones & Laughlin Steel Corp., supra,* 22–24, and from § 7, in itself a declaration of the policy which, in conjunction with § 10 (c), it adopts as the controlling guide to administrative action.

Before enactment of the National Labor Relations Act this Court had recognized that the maintenance of a "company union," dominated by the employer, may be a ready and effective means of obstructing self-organization of employees and their choice of their own representatives for the purpose of collective bargaining. Section 2 (3) of the Railway Labor Act of 1926, had provided that representatives, for the purposes of the Act, should be designated by employer and employees "without interference, influence, or coercion exercised by either party over the self-organization or designation of representatives by the other." We had held that in enforcing this provision, employer recognition of a company union might be enjoined and the union "disestablished," as an appropriate means of preventing interference with the rights secured to employees by the statute. *Texas & N. O. R. Co.* v. *Brotherhood of Railway & S. S. Clerks,* 281 U. S. 548, 560; see also *Virginian Ry. Co.* v. *System Federation No. 40,* 300 U. S. 515, 542 *et seq.*

Congress, in enacting the National Labor Relations Act, had in mind the experience in the administration of the Railway Labor Act, and declared that the former was "an amplification and further clarification of the principles" of the latter. Report of the House Committee on

Labor, H. R. 1147, 74th Cong., 1st Sess., p. 3. It had before it the *Railway Clerks* case which had emphasized the importance of union recognition in securing collective bargaining, Report of the Senate Committee on Education and Labor, S. Rep. 573, 74th Cong., 1st Sess., p. 17, and there were then available data showing that once an employer has conferred recognition on a particular organization it has a marked advantage over any other in securing the adherence of employees, and hence in preventing the recognition of any other.[2] The National Labor Relations Act continued and amplified the policy of the Railway Labor Act by its declaration in § 7, and by providing generally in § 8 that any interferences in the exercise of the rights guaranteed by § 7 and specifically the domination or interference with the formation or administration of any labor organization were unfair labor practices. To secure to employees the benefits of self-organization and collective bargaining through representatives of the employees' own choosing, the Board was authorized by § 10 (c) to order the abandonment of unfair labor practices and to take affirmative action which would carry out the policy of the Act.

In recommending the adoption of this latter provision the Senate Committee called attention to the decree which, in the *Railway Clerks* case, had compelled the employer to "disestablish its company union as representative of its employees." Report of the Senate Committee

---

[2] On the significance of recognition in collective bargaining see Commons and Andrews, Principles of Labor Legislation (Harper & Bros., 4th ed., 1936), p. 372; Catlin, The Labor Problem (Harper & Bros., 1935), pp. 431, 522; Rufener, Principles of Economics (Houghton-Mifflin Co., 1927), p. 399; Twentieth Century Fund, Inc., Labor and the Government (1935), p. 47; Yoder, Labor Economics and Labor Problems (1933), p. 443; U. S. Department of Labor, Bureau of Labor Statistics, Characteristics of Company Unions, Bulletin No. 634, Chs. VII, XXII.

on Education and Labor, *supra*. The report of the House Committee on Labor on this feature of the Act, after pointing out that collective bargaining is "a sham when the employer sits on both sides of the table by supporting a particular organization with which he deals," declared: "The orders will of course be adapted to the need of the individual case; they may include such matters as refraining from collective bargaining with a minority group, recognition of the agency chosen by the majority for the purposes of collective bargaining, posting of appropriate bulletins, refraining from bargaining with an organization corrupted by unfair labor practices." Report of the House Committee on Labor, *supra,* pp. 18, 24.

It is plain that the challenged provisions of the present order are of a kind contemplated by Congress in the enactment of § 10 (c) and are within its terms. There remains the question whether the findings adequately support them.

The Board's subsidiary findings of fact fully sustain its conclusion that respondents had engaged in unfair labor practices, by active participation in the organization and administration of the Employees Association, which they dominated throughout its history, and to whose financial support they had contributed; and that they had interfered with, restrained and coerced their employees in the exercise of the rights confirmed by § 7 to form for themselves a labor organization and to bargain collectively through representatives of their own choosing.

It is unnecessary to repeat in full detail the facts disclosed by the findings. They show that before the enactment of the National Labor Relations Act, respondents, whose employees were unorganized, initiated a project for their organization under company domination. In the course of its execution officers or other representatives of respondent were active in promoting the plan, in

urging employees to join, in the preparation of the details of organization, including the by-laws, in presiding over organization meetings, and in selecting employee representatives of the organization.

The by-laws and regulations provided that all motorbus operators, maintenance men and clerical employees, after three months service, automatically became members of the Association, and that only employees were eligible to act as employee representatives. No provisions were made for meetings of members, nor was a procedure established whereby employees might instruct their representatives, or whereby those representatives might disseminate information or reports. Grievances were to be taken up with regional committees with final review by a Joint Reviewing Committee made up of an equal number of regional chairmen and of management representatives, but review in those cases could not be secured unless there was a joint submission of the controversy by employee and management representatives.

Change of the by-laws without employer consent was precluded by a provision that amendment should be only on a two-thirds vote of the Joint Reviewing Committee, composed of equal numbers of employer and employee representatives. Employees paid no dues, all the Association expenses being borne by the management.

Although the Association was in terms created as a bargaining agency for the purpose of "providing adequate representation" for respondents' employees by "securing for them satisfactory adjustment of all controversial matters," it has functioned only to settle individual grievances. On the one recorded occasion when the employees sought a wage increase, the company representatives prevented its consideration by refusing to join in the submission to the Joint Reviewing Committee.

In May, 1935, shortly before the passage of the Act, certain of respondents' Pittsburgh employees organized a local union, Local Division No. 1063 of the Amalga-

mated Association of Street, Electric Railway and Motor Coach Employees of America, affiliated with the American Federation of Labor, and continued to hold meetings of the organization after the passage of the Act on July 5, 1935. Before and after that date, respondents' officers were active in warning employees against joining the union and in threatening them with discharge if they should join, and in keeping the union meetings under surveillance.

Section 10 (e) declares that the Board's findings of fact "if supported by evidence, shall be conclusive." Whether the continued recognition of the Employees Association by respondents would in itself be a continuing obstacle to the exercise of the employees' right of self-organization and to bargain collectively through representatives of their own choosing, is an inference of fact to be drawn by the Board from the evidence reviewed in its subsidiary findings. See *Swayne & Hoyt* v. *United States,* 300 U. S. 297.

We may assume that there are situations in which the Board would not be warranted in concluding that there was any occasion for withdrawal of employer recognition of an existing union before an election by employees under § 9 (c), even though it had ordered the employer to cease unfair labor practices. But here respondents, by unfair labor practices, have succeeded in establishing a company union so organized that it is incapable of functioning as a bargaining representative of employees. With no procedure for meetings of members or for instructing employee representatives, and with no power to bring grievances before the Joint Reviewing Committee without employer consent, the Association could not without amendment of its by-laws be used as a means of the collective bargaining contemplated by § 7; and amendment could not be had without the employer's approval.

In view of all the circumstances the Board could have thought that continued recognition of the Association would serve as a means of thwarting the policy of collective bargaining by enabling the employer to induce adherence of employees to the Association in the mistaken belief that it was truly representative and afforded an agency for collective bargaining, and thus to prevent self-organization. The inferences to be drawn were for the Board and not the courts. *Swayne & Hoyt* v. *United States, supra.* There was ample basis for its conclusion that withdrawal of recognition of the Association by respondents, accompanied by suitable publicity, was an appropriate way to give effect to the policy of the Act.

As the order did not run against the Association it is not entitled to notice and hearing. Its presence was not necessary in order to enable the Board to determine whether respondents had violated the statute or to make an appropriate order against them. See *General Investment Co.* v. *Lake Shore & M. S. Ry. Co.*, 260 U. S. 261, 285–286.

Respondents suggest that the case has become moot by reason of the fact that since the Board made its order it has certified the Brotherhood of Railroad Trainmen as representative of the motorbus drivers of the Pennsylvania company for purposes of collective bargaining and that in a pending proceeding under § 9 (c) for the certification of a representative of the other Pittsburgh employees, to which the Employees' Association is not a party, the Pennsylvania company and Local Division No. 1063, who are parties, have made no objection to the proposed certification. But an order of the character made by the Board, lawful when made, does not become moot because it is obeyed or because changing circumstances indicate that the need for it may be less than when made.

We have considered but find it unnecessary to comment upon other objections to the order, of less moment.

*Reversed.*

MR. JUSTICE CARDOZO and MR. JUSTICE REED took no part in the consideration or decision of this case.