## NATIONAL LABOR RELATIONS BOARD v. CUDAHY PACKING CO.

District Court, D. Kansas, First Division.

May 3, 1940.

Joseph A. Hoskins, of Kansas City, Mo., and Malcolm F. Halliday, of Washington, D. C., for petitioner.

Robertson, Boddington & Emerson, of Kansas City, Kan., and Thomas Creigh, of Chicago, Ill., for respondent.

HOPKINS, District Judge.

The National Labor Relations Board has made application for an order requiring the Cudahy Packing Company to produce books, records and information pursuant to subpoena duces tecum issued by the Board. The evidence is sought in aid of an inquiry by the Board to determine the bargaining representative of Cudahy employees.

The act, first effective July 5, 1935, United States Code Annotated, Title 29, Sections 151 to 166, declares the policy of the United States to be to eliminate the causes of and the obstruction to the free flow of commerce by encouraging collective bargaining, and by "Protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection" (Sec. 1). This declared policy is made effective by Section 7 of the Act, which guarantees to employees the right to self-organization, to form, join or assist labor organizations, the right to bargain collectively through representatives of their own choosing; and by Section 8 of the Act, which provides that it shall be an unfair labor practice for an employer to interfere with, restrain or coerce employees in the exercise of such rights, dominate or contribute support to any labor organization, discriminate as to terms and conditions of employment, and then encourage or discourage membership in any labor organization, or refuse to bargain collectively with representatives of his employees.

The National Labor Relations Board created by the act is given two principal functions to perform. One, defined by Section 9, which as enacted is headed Representatives and Elections, is the certification, after appropriate investigation and hearing of the name or names of representatives, for collective bargaining, designated or selected by an appropriate unit of employees. The other, defined by Section 10, which as enacted is headed Prevention of Unfair Labor Practices, is the prevention by the Board's order after hearing, and, if need be by further appropriate proceedings, in court, of the unfair labor practices enumerated in section 8.

Constitutional validity of the unfair labor practices section was upheld in National Labor Relations Board v. Jones & Laughlin, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, opinion by the Chief Justice. The representation feature of the act was upheld by the Supreme Court in two decisions by Mr. Justice Stone on January 2, 1940. National Labor Relations Board v. International Brotherhood of Electrical Workers, 308 U.S. 413, 60 S.Ct. 306, 84 L.Ed. 354, and American Fed. of Labor v. National Labor Relations Board, 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347. These two cases also interpret the review provisions of the act. The act authorizes the Board to apply to the Circuit Courts of Appeals for the enforcement of its orders restraining an unfair practice, and in like manner, the employer may have review of a "final order" of the Board. In either event, the jurisdiction of the Circuit Courts is of the same character and scope. Ford Motor Co. v. National Labor Relations Board, 305 U.S. 364, 59 S.Ct. 301, 83 L.Ed. 221. It is definitely settled that neither the Board's direction of election nor its certification of a particular union or representative is a "final order" subject to review. It is only after the election has been held and the Board has ordered an employer to do something predicated upon the results of an election, that review is authorized. These review limitations are important in passing upon the application now before this court. They evidence an intention on the part of the Congress that in the course of directing and holding an election and certifying the result, the Board be free of interruption. Abuse of this freedom is subject to court scrutiny on review of a final order.

The application under consideration recites: That the petition initiating the proceeding before the Board was filed June 7, 1937, United Packing House Workers Local Industrial No. 194, alleging that a question had arisen concerning representation of Cudahy employees. The Board ordered a hearing, which was held July 19 to 22, 1937. No action followed until February 1, 1938, when the Board consolidated that proceeding with another one initiated by the same union based upon a charge filed January 11, 1938, that Cudahy engaged in unfair labor practices, in that it encouraged its employees to join a company union, Packing House Workers Union, and discouraged membership in United Industrial No. 194. The company union on January 27, 1938, had intervened in the unfair practices proceeding, was a party at time of consolidation, and participated in a twelve-day hearing thereon during February, 1938.

As a result of the several days of hearing in February, 1938, the Board on May 13, 1938, issued an intermediate report finding Cudahy engaging in unfair labor practices, in that it was encouraging the company union. Exceptions to the report were filed by Cudahy May 31 and by the company union June 7, 1938. The exceptions were argued by Cudahy before the Board in Washington on two occasions, November 29, 1938, and August 3, 1939.

Following this, on September 29, 1939, the Amalgamated Meat Cutters and Butchers petitioned leave of the Board to intervene in the representation feature of the consolidated case. On October 19, 1939, after notice and without objections, Amalgamated was permitted to file its intervening petition and become a party to the representation proceedings.

November 4, 1939, the Board rendered its decision in the consolidated case. The unfair practices feature was disposed of by the Board finding that Cudahy "interfered with, restrained, and coerced its employees," dominated and contributed support to the company union. The board concluded that Cudahy should "cease and desist from such practices," and "withdraw all recognition of and to disestablish the P.H. W.U. as the representative of any of its employees for the purpose of dealing with the respondent in respect to grievances, labor disputes, wages, rates of pay, hours of employment, and other conditions of employment."

As to the representation feature of the consolidated case, the Board in substance found that in view of its order requiring Cudahy to disestablish and withdraw recognition of the company union, there existed a question concerning representation as between United Industrial No. 194, the group initiating the proceedings in 1938, and the Amalgamated, who were permitted to intervene in October, 1939. It found that a secret ballot election should be held with United Industrial No. 194 and Amalgamated on the ballot, and, as to the company union, "we shall make no provision for its inclusion on the ballot."

Conclusions of law and order directing election were entered accordingly. The direction of election provided:

"It Is Hereby Directed that * * * an election by secret ballot shall be conducted at such time as the Board shall in the future direct— * * * among all production and maintenance employees of the respondent at its Kansas City, Kansas plant who were employed by the respondent during a pay-roll period which the Board shall in the future specify, including employees who did not work during such pay-roll period because they were ill or on vacation and employees who were then or have since been temporarily laid off, but excluding foremen, assistant foremen, strawbosses, foreladies, and also excluding those employees who have since quit or been discharged for cause, to determine whether or not they desire to be represented by United Packing House Workers Loan Industrial Union No. 194, or by Amalgamated Meat Cutters and Butcher Workmen of North America, Local 574, for the purposes of collective bargaining, or by neither."

On November 10, 1939, a motion and affidavit in support thereof was filed by United Packing House Workers of America No. 10, C.I.O. affiliate, stating that on February 7, 1939, the name of United Industrial No. 194 was changed to United No. 10 and requesting amendment of the proceedings including the decision, order and direction of election accordingly. Cudahy by wire and letter and by motion protested the substitution and requested a hearing thereon. Thereafter, and on November 16, 1939, the Board entered its order amending the direction of election, overruling Cudahy's protest and request for hearing, amending the direction of election by striking the reference to United Industrial No. 194 and substituting United No. 10, C.I.O. affiliate, and by amending the reference to Amalgamated by addition of words showing its affiliation with the American Federation of Labor.

Thereafter, on February 10, 1940, the Board by supplemental direction of election ordered the election within thirty days thereafter. This supplemental direction was necessarily modified due to Cudahy's refusal to produce records. By order of March 7, 1940, the election was ordered "as soon after the date of this Supplemental Direction as may be practicable."

The application before this court recites that for purpose of the election it is necessary that employees eligible to vote be ascertained by the Board from the Cudahy payroll records; that on February 16 and 19 the Board demanded production of payroll and employment data, which demand was refused; that on February 21 the Board issued its subpoena duces tecum directing Cudahy to produce from its Kansas City, Kansas, plant before the Board in Kansas City, Missouri, the following:

1. Certified copy of the payroll of the Kansas City, Kansas, plant for the week ending February 3, 1940, identifying foremen, assistant foremen, straw bosses, and foreladies.

2. Employment records including the names and clock numbers of

(a) All production and maintenance employees of the Cudahy Packing Company, at its Kansas City, Kansas, plant employed during the payroll period ending February 3, 1940, segregating those employees who have since quit or been discharged for cause;

(b) All the production and maintenance employees of The Cudahy Packing Company, at its Kansas City, Kansas, plant who were absent from duty during the payroll period ending February 3, 1940, because they were ill or on vacation;

(c) All production and maintenance employees of The Cudahy Packing Company, at its Kansas City, Kansas, plant who on February 3, 1940, had been laid off for a period not exceeding 90 days.

Alleging that Cudahy had failed to obey the subpoena and that all the records requested thereby are relevant, necessary and material to its investigation, the Board applies to this court, as it is authorized to do under the act, for an order requiring obedience to the subpoena.

Cudahy filed a lengthy answer to the Board's application wherein it denies that any question has arisen which affects commerce; denies the right of the Board to take a secret ballot; denies jurisdiction of the court, questions service of the application, contending that the application should have been handled as a civil case under the rules of procedure with consequent issuance of summons, etc.; alleges the application fails to state a claim upon which relief can be granted; charges the Board with capricious, arbitrary and unreasonable conduct, and in support alleges that the hearing was closed in July, 1937, at which time the evidence established that the company union had a great majority and that the Board refused to decide in its favor, held up the decision and caused another proceeding to be

brought, intending and contriving thereby to decide the case contrary to the evidence, intending to certify United Industrial No. 194, C.I.O. affiliate, and that the record before the Board at the time of its decision November 4, 1939, established that the company union had a majority and that the Board, because it had made up its mind to decide in favor of United Industrial No. 194, arbitrarily disregarded the evidence and ordered an election to determine who held the majority. The answer alleges that the order of November 16, 1939, substituting parties without affording Cudahy a hearing, operated as an abandonment of the original complaint, and that the direction of election was issued without there being a complaint pending before the Board; that the Board's delay in making any decision following the hearing in July, 1937, constituted an abandonment of the complaint and that the Board is without jurisdiction; that the subpoena issued by the Board was void as there was no complaint pending. The answer charges that the subpoena is indefinite, the payrolls voluminous, that the record of each employee contains other information, his number, social security number, job rate per hour, hours worked each day and each week, deductions for old age benefits, insurance premiums, deferred wage payments, savings account, etc., constituting private papers and affairs of the company; that obedience to the subpoena would require segregation of employees who had quit or been discharged or were absent from duty, ill or on vacation during a certain period; and that to comply by taking the company's private files from Kansas to Missouri would constitute an unreasonable search and seizure and deprive the company of its liberty and property without due process of law. The answer denies the relevancy and materiality of the information sought. The following, the substance of which is repeated many times in the answer, illustrates Cudahy's contentions:

"The National Labor Relations Board, either entered into a conspiracy with the National C.I.O. organization or its officers to favor it and decide cases unjustly in its favor, or the said Board was so thoroughly imbued with prejudice against any labor organization not affiliated with C.I.O. that the said Labor Board, without any substantial evidence to support its decision and in willful disregard of the evidence and contrary to the evidence at said hearing,

and in bad faith, unreasonably and arbitrarily, and capriciously handed down its decision of November 4, 1939 to the effect that an election was necessary to be had at the Cudahy plant and for the same causes and under the same circumstances handed down its alleged orders directing the Regional Director to hold an election and fixing the payrolls of 1940 as the test of the right to vote instead of payrolls of 1937, all after it had lost jurisdiction under the original complaint filed in June, 1937, and without having any complaint at all before it upon which it was proceeding and thereupon and under the same circumstances and for the same reasons issued the alleged subpoena set forth in its petition.

"By reason of the premises and matters herein set forth the said subpoena is invalid and void."

With the issue thus made up, hearing was had before the court. The Board offered no testimony. Cudahy produced one Irving G. McCann formerly the trial examiner before the Board. He testified that he had gone to the records of the Labor Board in Washington and checked the records in the two cases which were consolidated into the proceeding involving the Cudahy Kansas City plant. He testified that the records disclosed Cudahy's objections and protest to the substitution of parties affected by the Board's order of November 16, 1939. Copies of the file were introduced in evidence.

McCann had been the trial examiner in the representation case filed against Cudahy, took testimony in Kansas City, Missouri, in the summer of 1937. He testified that the purpose of the hearing was to determine which labor union had a majority of the employees at the Cudahy plant for representation purposes. His testimony reads:

"Q. At the trial of that case, Mr. McCann, before you, was there any committee appointed for the purpose of investigating the membership cards and signatures, of the two Unions involved in that case, and contesting for the right to represent the employees? A. There was a committee appointed. They reported, and after certain modifications being made in the report, after I had sworn the three members of the committee, the report was accepted, and marked as Exhibit 3 of the Respondent.

"Q. And was that report admitted? Was there any admission on the part of the

C.I.O. Union, and the other Union involved, that it was an accurate report? A. As I recall, sir, they both stated that the report was accurate.

\* \* \* \* \*

"Q. Those representatives of the Unions were their respective secretaries, were they not? A. I believe they were.

"Q. That report you say was received in evidence in your case? A. It was.

"Q. Have you examined Exhibit A attached to the answer of the defendant herein? A. Yes, I have examined that.

"Q. Is that a correct copy of that report made by Blevins and Colgate? A. It is."

The Exhibit A referred to by the witness, attached to defendant's answer, is a finding by representatives of C.I.O. and the company union, that in June, 1937, the company union's membership exceeded 950, while C.I.O. membership cards signed were 185, cards unsigned 402, at most a total of 587. The testimony continues:

"Q. You finished the trial of that case in July, 1937, did you? A. Yes, sir.

"Q. Did you promptly make your trial examiner's report? A. I made a confidential report of the case to the National Labor Relations Board upon my return to Washington.

"Q. How soon was that after the trial was finished? A. I cannot say definitely, but I believe that it was within a week or ten days \* \* \*

"Q. Did that end your services as examiner in the case? A. That ended my official connection with the case. \* \* \*

"Q. Did you, after that, make any inquiry as a matter of information or curiosity as to what had been done with the case? A. I did.

"Q. Of whom did you make the inquiry, and what was said? A. \* \* \* I suppose it was approximately thirty days after my official connection had ended when I made inquiry as to who this case had been assigned to, and was directed to, I think, the man that is spoken of in the front of this decision as Mr. Pascal, but I was not sure who he was at that time, a review attorney who had this case under advisement, and I asked him what had been done with respect to the election and he stated to me 'after studying your file we have decided that you made such a good case against the company or the local Union that we will proceed to file a complaint, or have a complaint, a case filed against the Cudahy Packing Company trying to disestablish the local Union and then hold an election after they are disestablished.' Furthermore, as I recall it, either he at that time, or George Pratt, who was about that time transferred to Washington as Chief Trial Examiner and who had been Regional Director at Kansas City, told me that the reason for following this procedure was because the so-called Company Union had given such excellent attention to the complaints of the employees of Cudahy Company, insofar as hours, wages, etc., were concerned, that they were afraid to hold an election for fear the Company Union would win, so that they wanted to have this disestablished prior to having the election. That was the total of the conversation I had with respect to this case.

\* \* \* \* \*

"Q. Did you have a conversation with the Secretary of the National Labor Relations Board at the time you were being considered as an examiner? A. I did.

"Q. What was that conversation? A. He asked me what my background was, and what my family and antecedents had been.

"The Court: Who was this? A. The Secretary of the Labor Relations Board.

"Mr. Hoskins: May we know who this was? A. Mr. Wolfe—Mr. Benedict Wolfe. I stated my family had been in the ministry for approximately a hundred years, and in law and medicine for fifty years back of that, and he said, 'you have the wrong background for one to act as an examiner for the Labor Relations Board. We want people who have a labor background.'

\* \* \* \* \*

"Q. Do you know what the attitude of the Board and the Secretary was toward examiners who would return in a report in favor of the employers. A. I have nothing on the general propositions that I can answer, but I know when I handed in a report in favor of an employer in December, 1937 that the trial examiner—the Chief Trial Examiner—studied the report for two weeks, came back to me, and said, 'Mr. McCann, I am now prepared to tell you how you can find for the Union.' And I said, 'George the Union is not entitled to be found for in this case. Their witnesses lied. They attempted to put in testimony that was

false. The principal witnesses for the Union testified that the respondent's superintendent was a man upon whose word a house I would build.' And George, after talking to me even and asking or telling me that he could show me how I could find for the Union said, 'Well, of course, I don't want you to do anything that you cannot do conscientiously.' I made my report in this case and proceeded to look for a job, because I did not expect any further work with the Board.

"Q. Did you get anything? Did you get any work after that? A. I didn't ask to take any assignments after that decision.

\* \* \* \* \*

"Q. Was there any rule there about an examiner who had been criticised by the Unions in his conduct of a case? A. \* \* \* I should say, when there are two criticisms of a trial examiner by the Unions that ended the employment."

The Board, by motion to strike from the answer and by objections to the evidence question the relevancy and materiality of the defense set up by Cudahy. And that serves to raise the real issues before this court: What right has the Board to an order compelling obedience to its subpoena; and to what extent is the court limited in considering the question?

Section 11 (1, 2) of the Act, 29 U.S.C.A. § 161 (1, 2) provides:

"The Board, or its duly authorized agents or agencies, shall at all reasonable times have access to, for the purpose of examination, and the right to copy any evidence of any person being investigated or proceeded against that relates to any matter under investigation or in question. Any member of the Board shall have power to issue subpenas requiring the attendance and testimony of witnesses and the production of any evidence that relates to any matter under investigation or in question, before the Board. \* \* \*

"In case of contumacy or refusal to obey a subpena issued to any person, any District Court of the United States \* \* \* within the jurisdiction of which the inquiry is carried on or within the jurisdiction of which said person guilty of contumacy or refusal to obey is found or resides or transacts business, upon application by the Board shall have jurisdiction to issue to such person an order requiring such person to appear before the Board, its member, agent, or agency, there to produce evidence if so ordered, or there to give testimony touching the matter under investigation or in question \* \* \*."

The foregoing provisions are not new in the law governing administrative agencies of the National Government. The Interstate Commerce Commission has for years been invested with similar authority, and in the case of Interstate Commerce Commission v. Brimson, 154 U.S. 447, 14 S.Ct. 1125, 1133, 38 L.Ed. 1047, the court said: "As every citizen is bound to obey the law and to yield obedience to the constituted authorities acting within the law, this power conferred upon the commission imposes upon anyone summoned by that body to appear and to testify the duty of appearing and testifying, and upon anyone required to produce such books, papers, tariffs, contracts, agreements, and documents the duty of producing them, if the testimony sought, and the books, papers, etc., called for, relate to the matter under investigation, if such matter is one which the commission is legally entitled to investigate, and if the witness is not excused, on some personal ground, from doing what the commission requires at his hands."

See, also, In re Securities and Exchange Commission, 2 Cir., 84 F.2d 316, 318.

Section 11 of the Act, supra, was ruled upon by the federal District Court in Connecticut, National Labor Relations Board v. New England Transportation Co., 14 F.Supp. 497, 499: "One further question is raised by the respondents. It is contended that the application is too broad in calling for the 'pay roll' of the entire company except for the supervisory employees who have authority to employ and discharge. As to this, it is true that the moving papers disclose that the pending investigation and the contemplated election relate only to the respondents' mechanical department. That being so, I should not suppose the board would be directly interested in the entire personnel. Nevertheless, the board may properly have an indirect interest therein. For it well may be that certain employees may have overlapping duties; some may be employed part time in the mechanical department and part time elsewhere. In the first instance, at least, it rests with the board to determine whether any such employees for purposes of the contemplated election should be classified with the mechanical department. I hold, therefore, that the board is entitled to the list of the entire personnel, in order

that it may after due consideration make an accurate classification."

It is unnecessary to consider in specific detail all of the many points raised in the Cudahy answer. The attitude of the Supreme Court as expressed in its several decisions construing the act with special reference to the recent case of National Labor Relations Board v. Falk Corp., 308 U.S. 453, 60 S.Ct. 307, 310, 84 L.Ed. 396 (Jan. 2, 1940) considered in connection with the review provisions of the act hereinbefore discussed, serves to answer many of the contentions. In the Falk case, the Seventh Circuit Court of Appeals, 106 F.2d 454, reviewing the Board's petition for enforcement of its order directing an election, whereby it omitted from the ballot a company dominated union, held the order valid; but, the Circuit Court, of its own volition, injected a new condition. The Supreme Court said: "We think it apparent that the conditions attached by the court to the Board's order operated as a modification of the Board's Direction that Independent be omitted from the ballot. * * * But Section 9 of the Act vests power in the Board, not in the court, to select the method. * * * The court has no right to review a proposed election, and in effect to supervise the manner in which it shall thereafter be conducted."

■ Cudahy denies there is any question involved affecting commerce. But the Board heard evidence for many days and found as a fact and concluded commerce was affected. The act makes findings of the Board, if supported by evidence, conclusive. And see Santa Cruz Fruit Packing Co. v. National Labor Relations Board, 303 U.S. 453, 58 S.Ct. 656, 82 L.Ed. 954; Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126; National Labor Relations Board v. Jones & Laughlin, supra. The right of the Board to take a secret ballot is questioned, but the act authorized the Board to "take a secret ballot of employees, or utilize any other suitable method." Section 9(c) of the act, 29 U.S.C.A. § 159(c).

■ Failure of the Board to certify the company union when it was shown to have a majority in 1937, and the subsequent steps in the proceeding, linked with the testimony of the witness McCann, are strongly urged as establishing arbitrary and capricious conduct on the part of the Board. The Board, whether properly or not, subsequently found the company union to be dominated and supported by Cudahy. That is to say, that the company union was fettered by employer control. Thereupon, the Board, by its final order, directed Cudahy to cease and desist from dominating and contributing support to the company union. It occurs to the court that with employer influence removed, there would appear to be no sound reason for omitting the name of the company union from the ballot. If the employees are to express their preference, why should they not be given an opportunity to vote for the company union? The act does not require that the bargaining representative be affiliated with a national labor organization. The Board found that the effects and consequences of employer domination "will constitute a continuing obstacle" to the employees' right to self-organization, and, therefore, Cudahy was further ordered to completely disestablish the company union and was enjoined from further negotiating with it. The findings that dealings with the company union, after removal of employer domination and support, would constitute a continuing obstacle, could, of course, only be supported by inference. But the Supreme Court has said that is sufficient, and, further, that "the inferences to be drawn were for the Board and not the courts." National Labor Relations Board v. Greyhound Lines, 303 U.S. 261, 271, 58 S.Ct. 571, 576, 82 L.Ed. 831, 115 A.L.R. 307.

■ Cudahy next contends the Board's application here should have been treated as a civil action, with consequent issuance and service of a summons, following the Rules of Civil Procedure, 28 U.S.C.A. following section 723c. In view of the lengthy answer and many contentions, that might have been more suitable procedure. But Rule 7 provides that "an application to the court for an order shall be by motion," and in my opinion Cudahy has not been prejudiced by the procedure followed. In support of its contention in this respect, Cudahy relies upon the case of Interstate Commerce Comm. v. Brimson, supra, and much stress is laid upon the holding therein that an appeal will lie from an order of the district court in a proceedings such as this. Granting that an appeal lies, how does that change things? Applied to this proceeding, scope of the review thus afforded will be limited by the review provisions of the

Wagner Act. Surely the parties cannot in that indirect manner obtain review of discretionary rulings of the Board not reviewable under the act except on application for enforcement or review of a final order of the Board.

The amendment of the proceedings to show United Industrial 194 under a new name (United No. 10) does not affect validity of the proceedings.

But this discussion has been unduly extended. Subject to certain conditions, the court is of the opinion the subpoena should be obeyed. The act says the court shall have jurisdiction to issue an order requiring obedience to the Board's subpoena. It does not say obedience shall be ordered as of course. Certainly the act contemplates that the court will exercise a reasonable discretion. Certainly also, the court has inherent power and authority over its own process to prevent abuse thereof, oppression and injustice.

It is the view of the court, therefore, that following an order of the Board directing an election at the Cudahy plant in Kansas City, Kansas, on a particular date, if a subpoena duces tecum shall then issue by the Board requiring Cudahy to furnish the Board on a specific date prior to the election a copy of its payroll and employment records, certified to by an officer of the company, with explanatory datas as to each employee showing nature of work performed, with notation of those ill or on vacation, or laid off for any reason within a reasonable period prior to the certification of the copy of the payroll record, identifying foremen, assistant foremen, straw bosses, and foreladies, the court, if need be, will compel obedience thereto. The company will not be required to take its private files to the headquarters of the Board. A representative of the Board together with a representative of the company may personally check the files and records at the offices of the company.

In fact, it appears to this court that a reasonable spirit of co-operation on the part of both the Board and the employer might eliminate this entire controversy. Due to the long delay before the Labor Board, and many intervening and collateral issues which have grown into the proceeding, and the fact the validity of the order disestablishing the company union is before the Circuit Court, it occurs to this court to suggest that the Board might well abandon

this proceeding in its entirety and start anew following the Circuit Court's decision.

A proper order, embodying findings deemed essential, may be prepared and submitted.