**NATIONAL LABOR RELATIONS BOARD**
**v. VIKING PUMP CO.**
**No. 470, Original.**

Circuit Court of Appeals, Eighth Circuit.
July 29, 1940.

Rehearing Denied Sept. 9, 1940.

A. Norman Somers. Atty., of Washington, D. C. (Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, Laurence A. Knapp, Asst. Gen. Counsel, Allen Heald, Atty., and Harry Selekman, Atty., all of Washington, D. C., on the brief), for National Labor Relations Board.

James B. Newman, of Cedar Falls, Iowa, (George F. Newman, of Cedar Falls, Iowa, on the brief), for respondent.

Before GARDNER and SANBORN, Circuit Judges, and COLLET, District Judge.

GARDNER, Circuit Judge.

This case comes before us upon petition of the National Labor Relations Board to enforce its cease and desist order issued against respondent, pursuant to Section 10 (c) of the National Labor Relations Act, 29 U.S.C.A. § 160(c).

Charges and amended charges were filed on behalf of Lodge 1683, Amalgamated Association of Iron, Steel, and Tin Workers of North America (referred to hereinafter as "Union"). The complaint alleged that respondent had engaged in unfair labor practices within the meaning of Section 8 (1) and (3) of the National Labor Relations Act, 29 U.S.C.A. § 158(1, 3). A hearing was held and the trial examiner filed an intermediate report finding violations as alleged. Respondent filed exceptions to this report. Amended charges were then filed, alleging further unfair labor practices, and a further hearing was held before another trial examiner. In an intermediate report he also found violations as alleged. The Board filed its decision finding that respondent had engaged in unfair labor practices affecting commerce within the meaning of the Act by (1) interfering with, restraining and coercing its employees in their right to self-organization; and (2) discriminatorily discharging two of its employees because of their Union activity, and discharging a third because he gave testimony under the Act. It ordered respondent to cease and desist from these unfair labor practices and as an affirmative action

to effectuate the policies of the Act, it ordered a reinstatement with back pay of the employees found to have been discriminated against, and it ordered appropriate notices to be posted.

Respondent has refused to comply with the order of the Board on the ground that it is not supported by the evidence but "is opposed to all the competent, credible and substantial evidence in the record."

 Our review of the record is for the purpose of determining whether the findings of the Board are sustained by substantial evidence. We need not concern ourselves with the question of the burden of proof, the credibility of the witnesses, nor the weight or preponderance of the evidence. Hamilton-Brown Shoe Co. v. National Labor Relations Board, 8 Cir., 104 F.2d 49; National Labor Relations Board v. Waterman Steamship Co., 309 U. S. 206, 60 S.Ct. 493, 84 L.Ed. 704; National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307. We therefore note primarily the evidence which sustains or tends to sustain the findings.

The first question is as to the finding that respondent had interfered with, restrained and coerced its employees in their right of self-organization.

Respondent manufactures and markets rotary pumps at its place of business at Cedar Falls, Iowa. The Union began its efforts to organize respondent's employees about April 28, 1937. A few days later, May 4, there was a meeting of some twenty-eight of the employees, held during working hours. Harry Petersen, foreman of the small pump department, addressed the meeting and, among other things, said: "This Union business has got to—has gone far enough. It is causing a lot of discord. * * * Mr. Wyth (president of respondent) has proxies enough to rule the Board of Directors, and * * * he is going to close the shop down if this Union business continues. * * * Mr. Wyth wouldn't recognize an outside labor organization in the plant. * * * Before Mr. Wyth would recognize any outside organization in the plant he would go home and sit on his front porch and lock the plant up."

In this same address, he advised the employees "to drop out of the Union and to go down to Mr. Wyth's office and talk it over with him." He urged the employees to change the Viking Aid Society, an existing society, into a union, and thus they would have their own union; that there would be no dues to pay, other than the Viking Aid dues, 25¢ a month. He said that Mr. Wyth would recognize that and deal with them but not with an outside labor organization.

On the following day, during working hours, all of the employees assembled in the stock room, pursuant to instructions from their foremen and other supervisory officers. Three foremen were present. At the suggestion of Mr. Juhl, a "trouble shooter" of respondent, Mr. Gushard, was called in to speak. He informed the meeting that Mr. Wyth would not have an outside organization in the plant but would close the plant unless the men immediately elected a committee, which had been previously suggested as a proper method of agreement with the employer. The meeting then elected a committee, which held some conferences with Wyth. Mr. Wyth told the committee members that he had authority to close the shop if the men had not elected the committee, and on one occasion he said: "This is the only body I will deal with. I will not deal with no C. I. O.". As a result of these conferences, Mr. Wyth granted a wage increase, and Mr. Gushard told the men that the committee had obtained a good agreement. Foreman Petersen asked an employee if the raise in wages had caused any of the men "to sell out, if the raise was sufficient to cause anybody to drop their membership in the Union." Foreman Eastman advised some employees, "that we forget about the Union because we would never get anywhere, * * * we would only be paying the officers our money and that it wouldn't amount to anything."

 Following these incidents, certain employees who had been active in Union work were discharged. Certain alleged acts of espionage are also cited by the Board as sustaining the finding of interference, restraint and coercion. We put aside the testimony as to these acts as unnecessary for consideration because we are satisfied that the evidence above detailed is abundantly sufficient to sustain the Board's finding of interference, restraint and coercion. The president and superintendent availed themselves of the efforts of the foremen to defeat any movement by the employees in the plant to join "an outside Union." The evidence tends to show that supervisory employees and officials were working to a

common purpose. We must assume, in view of the decision of the Board, that this evidence was believed by the Board, and it is sufficient to support a finding of employer participation. Montgomery Ward & Co., Inc. v. National Labor Relations Board, 7 Cir., 107 F.2d 555.

■ The second question is concerned with the discharge of employees found to have been discriminatory. Harold Poulson, a machine operator, had worked for respondent for eight years. He was unceremoniously discharged August 25, 1937. While he was at work at his lathe a foreman came to him and handed him a pay check. Poulson asked why he was getting his check, to which inquiry the foreman replied that he didn't know—"that Mr. Wyth sent it out from the office by one of the office girls." The next day Poulson saw Gushard, the superintendent, and asked him why he was discharged from the job. Gushard referred to some incident which had occurred early in the spring of 1937, in connection with which Poulson had been asked by the foreman to take charge of the night shift, which Poulson declined to do because of the responsibility. Gushard accused him of trying to dictate to him as to how to run the shop. Another reason given by Gushard for the discharge was that in April, 1937, Poulson had asked him for a raise. After his interview with Superintendent Gushard, Poulson then went to Mr. Wyth, who told him he was laid off for lack of work, and also that he talked too much. Poulson then asked Wyth what he talked too much about, to which Wyth replied, "Oh, you know, this thing that's going on around, causing all of these strikes and everything." Poulson was active in the Union.

Gushard, as a witness on behalf of respondent, testified that Poulson was discharged because he left his machine during working hours. Poulson's work was satisfactory. He had served as night foreman once. On August 26, Gushard gave him a letter in which he said: "Harold Poulson has been in our employ continuously since May 17, 1929. He is temperate, very regular, and as to his ability as a machinist, I heartily recommend him on almost any type of machine."

Poulson testified that whenever men met during this "organizing period," the topic of conversation was representation of the workers. He had never been reprimanded prior to his discharge. The evidence here, we think, is sufficient to sustain the finding of the Board that Poulson was discriminated against contrary to the provisions of Section 8 (1) (3). True, there is some evidence from which the Board might have found that he was discharged for incivility and insubordination because he did not want to accept a job as night foreman and because he asked for an increase in wages. But this evidence was not of such character as to compel a finding that his discharge was based upon these grounds.

On the day preceding Poulson's discharge, Ferris Aldrich, a pump tester, was discharged. He too had been active in Union activities. He was discharged without preliminary notice of any kind, although he had worked seven years for respondent. When he asked for an explanation, his foreman said that Wyth "had not forgotten the Union." He asked Gushard the reason for his discharge and was told that Wyth "just picked him out." As in the case of Poulson, Gushard gave him a letter of recommendation. Wyth told him his work was satisfactory; that business was bad, and suggested that he go over to Deere's but not to get mixed up in anything. It is urged that Aldrich was discharged "because he solicited memberships in the Union during working hours, threatening his associates that unless they joined they would lose their jobs, hiding their tools, and spending too much time away from his work in organizational activities during working hours in the plant, and although warned by his foreman to watch his step, persisted in such conduct." A witness for respondent testified that Aldrich hid his tools and called him names because he would not sign up for the Union. A foreman testified with reference to Aldrich that:

"And judging from the other men in the plant, I would say that he was quite a hand to visit and talk with the other fellows and naturally, I say, it was natural for him to talk to the fellows. He liked to talk to one fellow and the rest of them. * * *

"Well, his work was of such nature that he would go—that he would finish a few special pumps, then he would have to go back over to one bench and pick up the pumps and take them down to the test block and test them, and then each time he would come in contact with three or four different fellows and naturally, a conversation would take place."

This does not seem to be a very serious indictment as the basis for his discharge. The witness testified that Aldrich was a fair workman, and a reading of his entire testimony, which is fairly summarized by the above quotation, fails to reveal anything serious in the conduct of Aldrich, and if his immediate superior could find nothing specifically wrong with his conduct, the Board was justified, under the circumstances disclosed by the record, in finding his discharge discriminatory.

Lloyd L. Siglin, who had been employed by respondent as a janitor since 1935, joined the Union April 26, 1937. He attended its meetings until May, 1937, but discontinued doing so when the son of the president of respondent advised him to be careful about going to the meetings of the Union. The president warned him that he would discharge anyone whom he caught talking "C. I. O." on the premises. He testified as a witness on the original complaint in this case to having found a piece of scrap paper about a week before the hearing in the directors' room. This paper bore the words, "Find something on Poulson and Aldrich," and other writing. He made a copy of it, which he produced at the hearing. He could not identify the handwriting on the original. On the evening following his testimony, his keys were taken from him by a foreman at his home, and at a conference the following morning between representatives of respondent and the Board and the Union, respondent's attorneys said that Siglin could not work as janitor again. Gushard remarked that he did not think Siglin would want a job in the office after what he had done, but told Siglin he would be given an opportunity to try for a job as a painter, caster, or worker in the shipping department, and was told to report for work several days later. On May 3, he returned to the plant, pursuant to instructions, where he heard one Frank Stevens report his arrival to the president, who called him a vulgar name and instructed Stevens to tell him to go home, "We will call him when we want him." Siglin spoke to Gushard, who told him to go home until he was called, and promised he would be paid for the time he was off. The Board hearing ended May 4. On May 6, Siglin was given a job of cleaning tanks, which was temporary work. On May 13, he was laid off with sixteen other employees. He received no pay for the idle period, as promised. Gushard said

the deal "fell through." The Board found that respondent had no intention to give permanent employment to Siglin, or to reinstate him, but that it merely intended to forestall action by the Board while the first hearing was in progress; that Siglin was discharged because of a desire to punish him for loyalty to the Union. We can not say that these inferences find no support in the evidence. The evidence reflects a manifest hostility to Siglin immediately following his testimony before the Board. He had been warned to refrain from Union activity. We conclude that the evidence was sufficient to sustain the charge of discrimination under Section 8 (1) (3) (4). The cease and desist order was therefore proper.

 The reinstatement of Aldrich, Poulson and Siglin to their former positions with back pay is a remedy specifically authorized by Section 10 (c) of the Act. Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126; National Labor Relations Board v. Fainblatt, 306 U.S. 601, 59 S.Ct. 668, 83 L.Ed. 1014; Hamilton-Brown Shoe Co. v. National Labor Relations Board, supra.

Being of the view that the Board's order is valid, the petition for its enforcement is granted.