299 F.2d 497
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
PLUMBERS UNION OF NASSAU COUNTY, LOCAL 457, UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF the PLUMBING AND PIPEFITTING INDUSTRY OF the UNITED STATES AND CANADA, AFL-CIO, Respondent.
 No. 203.
 Docket 27188.
 United States Court of Appeals Second Circuit.
 Argued January 18, 1962.
 Decided February 6, 1962.
 
 COPYRIGHT MATERIAL OMITTED Stephen B. Goldberg, Atty., N.L.R.B., Washington, D. C. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associte Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Melvin J. Welles, Atty., N.L.R.B., Washington, D. C., on the brief), for petitioner.
 Aaron Weissman of Delson, Levin and Gordon, New York City, for respondent.
 Before MEDINA, MOORE and SMITH, Circuit Judges.
 SMITH, Circuit Judge.
 
 
 1
 The National Labor Relations Board found Respondent, Plumbers Union of Nassau County, Local 457, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO, had threatened and coerced neutral employers on a building construction job to cease doing business with Bady, the non-union plumbing contractor on the job, within the meaning of Section 8(b) (4) (ii) of the National Labor Relations Act, and with inducing or encouraging employees of neutral employers at the job to strike or refuse to perform services within the meaning of 8(b) (4) (i). The Board ordered respondent, its officers, etc., to cease and desist from these practices and to post appropriate notices, and now petitions this court for a decree enforcing in whole the order of the Board.
 
 
 2
 Enforcement ordered.
 
 
 3
 Searington Associates, Inc. and Shelter Rock Tennis Club, Inc., affiliated corporations, hereinafter referred to as Shelter Rock, undertook to build for their members a tennis and swimming club in Nassau County, New York. Shelter Rock contracted with various contractors for construction services on the job, all of which contractors were unionized but one, Bady d/b/a Bomat, the rough and finished plumbing contractor, at whose suggestion there was incorporated in his contract a provision that all labor supplied by Bomat should be non-union.
 
 
 4
 Mullen, an agent of the union, on visiting the job site March 28, 1960, learned there were no union plumbers on the job. He unsuccessfully sought to have Bady's men join or to have Bady hire union members, threatening to "knock off" the job and to have the union mechanics of other trades pulled off the job. Mullen talked to Rodriguez, president of Shelter Rock, telling him union plumbers would have to be employed or he would stop the job. Both Rodriguez and Mullen tried to obtain a compromise agreement from Bady but Bady refused. Mullen's threats to Bady were heard both by other employers on the job and by some of their employees. March 30, 1960 the other workers walked off except for some electricians, who later ceased work. March 31, 1960 a picket for the union was placed at the only entrance to the job site, with a sign as follows:
 
 TO THE PUBLIC
 
 5
 THE PLUMBING CONTRACTOR ON THIS JOB EMPLOYS NON-UNION PLUMBERS & DOES NOT HAVE A CONTRACT WITH PLUMBERS LOCAL #457
 
 The sign was later changed to read:
 TO THE PUBLIC
 
 6
 MEMBERS OF PLUMBERS LOCAL 457 ARE NOT EMPLOYED ON THIS JOB
 
 
 7
 Unfair labor practice charges were filed by Bady, a complaint issued, and application was made for an injunction. April 13, 1960 Judge Abruzzo suggested that the parties compromise. Bady refused all suggestions. Picketing ceased April 14, the union mechanics returned to work the next day. April 20, 1960 Shelter Rock informed Bady that the finish plumbing work would be performed by union labor, either by Bomat or others. April 25, 1960 a temporary injunction issued. The union was unaware of the existence of the Bomat contract provision against employment of union labor until the Labor Board hearing May 16, 1960.
 
 
 8
 On these facts the trial examiner recommended dismissal of the complaint because of the "non-union closed shop" provision in Bomat's contract, termed a "yellow dog" contract. The Board disagreed, entered the order referred to above and seeks enforcement.
 
 
 9
 * The Board found, in accordance with the stipulation of the parties, that Bady was an employer and a person engaged in commerce. It is contended, however, that Shelter Rock and the subcontractors other than Bady were not shown to be in commerce or in an industry affecting commerce, as the Board found them to be. More specific evidence and findings were not essential under the facts of this case. Section 8(b) (4) (i) and (ii) of the amended Act extends to proscribed actions which are directed to "any individual employed by any person engaged in commerce or in an industry affecting commerce" (emphasis added). While Shelter Rock, the country club, may not have been engaged in an industry affecting commerce, it was open to the Board to infer, from the stipulation as to Bomat's volume of business in commerce, and the nature of the construction job here, in the light of its experience in this field, that a work stoppage by all the building crafts on the job would substantially affect the flow of materials into the state for incorporation into the building under construction, and that consequently Shelter Rock, the general contractor, was so engaged. While Shelter Rock and the contractors other than Bady may not have been shown to have been in commerce, a dispute stopping their work on the job is properly held to affect commerce. N. L. R. B. v. Denver Bldg. & Construction Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L. Ed. 1284 (1951), International Broth. of Elec. Workers, etc. v. N. L. R. B., 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299 (1951), Local 74 v. N. L. R. B., 341 U.S. 707, 71 S.Ct. 966, 95 L.Ed. 1309 (1951).
 
 II
 
 10
 The threats to stop the job and to pull the other crafts off the job unless Bady capitulated, communicated to Shelter Rock and the other neutral employers, clearly violated 8(b) (4) (ii) (B) of the Act, as threats to "any person" to force the cessation of business with Bady. N. L. R. B. v. International Hod Carriers, Local 1140, 285 F.2d 397, 403 (8 Cir. 1960), cert. denied 366 U.S. 903, 81 S.Ct. 1047, 6 L.Ed.2d 203.
 
 III
 
 11
 In view of Mullen's statements, that he was going to exert pressure on Bady, and that he was going to pull the men off the job, his association on the job site with the representatives of the other unions on the job, the simultaneous walkout shortly after Bady refused to cooperate, and the simultaneous return after Shelter Rock agreed to require Bady to comply, the Board was justified in its inference that Local 457 was responsible for inducing the employees of the neutral employers to engage in a work stoppage for the forbidden purpose of forcing Shelter Rock to terminate its contract with Bady unless he would contract with the union. N. L. R. B. v. Denver Bldg. & Construction Trades Council, supra, International Broth. of Elec. Workers, etc. v. N. L. R. B., supra.
 
 IV
 
 12
 Respondent seeks to bring the picketing within Moore Dry Dock, 92 N. L.R.B. 547, as proper primary situs picketing. This effort, however, is unsuccessful, since the second sign carried by the pickets at the sole entrance to the job site utterly fails to identify Bady, the primary employer, as the target of the dispute. Condition (d) of the Moore formula is that "the picketing discloses clearly that the dispute is with the primary employer." 92 N.L.R.B. 547 at 549.
 
 V
 
 13
 The union contends that the Board was in error in overruling the trial examiner's conclusion that the no-union clause in Bady's contract should bar relief before the Board. However, the clause was unknown to the union at the time of the union's illegal conduct, and so in no way induced it. Moreover, one illegality should not excuse another. N. L. R. B. v. Remington Rand, Inc., 94 F.2d 862, 872 (2 Cir.1938). The public interest lies in labor peace, endangered by both. The remedy here was in the filing of charges before the Board when the claimed illegality came to light, not in illegal selfhelp. Superior Derrick Corp. v. N. L. R. B., 273 F.2d 891, 893 (5 Cir.1960), cert. denied Seafarers' International Union, etc. v. N. L. R. B., 364 U.S. 816, 81 S. Ct. 47, 5 L.Ed.2d 47. Nor can we agree that the existence of any illegality so taints the proceedings that the Board should have declined to consider them at all. Such a doctrine is properly confined to acts affecting the processes of the Board itself, as in Vaughn Bowen, 93 N. L.R.B. 1147, where the very initial hiring was part of a collusive plan to manufacture a case for Board action.
 
 VI
 
 14
 The union contends alternatively that relief should be denied because the owner here, Shelter Rock, was an ally of Bady. This, however, ignores the interest of the other contractors, International Broth. of Elec. Workers v. N. L. R. B., 181 F.2d 34, 37 (2 Cir.1950), aff'd 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299, and in any event is not supported by the proof. Bady owned a share in Shelter Rock as a member amounting to 1/300th. He appears to have had no connection with its management or control. The offensive provision in the contract was inserted by Bady. No anti-union bias of Shelter Rock is shown, substantially all other contractors on the job being unionized. Indeed, far from taking Bady's part when the hiring of non-union labor on the job was questioned, Shelter Rock first tried to induce Bady to accede to the union demands, and promptly threw him overboard when he refused. There is here no intended or actual common cause or alliance on the part of Shelter Rock with Bady. No work of Bady's was "farmed out" to Shelter Rock to avoid the effects of a strike.
 
 VII
 
 15
 Finally, termination of the picketing, the walkout and the particular job itself do not render the Board's order moot. N. L. R. B. v. Pennsylvania Greyhound Lines, 303 U.S. 261, 271, 58 S.Ct. 571, 82 L.Ed. 831 (1938), Local 1976, Carpenters Union v. N. L. R. B., 357 U.S. 93, 97 note 2, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1952), N. L. R. B. v. General Motors, 179 F.2d 221, 222 (2 Cir.1950).
 
 
 16
 The order of the Board will be enforced.