## NATIONAL LABOR RELATIONS BOARD v. GERMAIN SEED & PLANT CO.
### No. 10082.

Circuit Court of Appeals, Ninth Circuit.

Feb. 8, 1943.

Rehearing Denied March 12, 1943.

Robert B. Watts, Gen. Counsel, N.L.R.B., Ernest A. Gross, Associate Gen. Counsel, Howard Lichtenstein, Asst. Gen. Counsel, Morris P. Glushien, Joseph B. Robison, and Sidney L. Davis, Attys., N.L.R.B., all of Washington, D. C., and Guy Farmer, Regional Atty., N.L.R.B., of Washington, D. C., for petitioner.

Latham & Watkins, Paul R. Watkins, and Richard W. Lund, all of Los Angeles, Cal., for respondent.

Joseph L. Fainer and Russell E. Parsons, both of Los Angeles, Cal., for intervenor Consolidated Seedsmen's Union, Inc.

Before DENMAN, MATHEWS, and STEPHENS, Circuit Judges.

MATHEWS, Circuit Judge.

On April 5, 1941, the National Labor Relations Board issued a complaint against respondent, Germain Seed & Plant Company, a California corporation. Respondent answered, a hearing was had, and on December 31, 1941, the Board stated its findings, issued an order and caused the order to be served on respondent. The order requires respondent to—

"1. Cease and desist from:

"(a) Dominating or interfering with the administration of Consolidated Seedsmen's Union, Inc., or with the formation or administration of any other labor organization of its employees, and contributing financial or other support to Consolidated Seedsmen's Union, Inc., or to any other labor organization of its employees;

"(b) Recognizing Consolidated Seedsmen's Union, Inc., as the representative of any of its employees for the purpose of dealing with the respondent concerning grievances, labor disputes, wages, rates of pay, hours of employment, or other conditions of work;

"(c) In any other manner interfering with, restraining, or coercing its employees in the exercise of the right to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purposes of collective bargaining or other mutual aid and protection, as guaranteed in Section 7 of the [National Labor Relations Act,[1] 29 U.S.C.A. § 157].

"2. Take the following affirmative action which the Board finds will effectuate the policies of the Act:

"(a) Withdraw all recognition from Consolidated Seedsmen's Union, Inc., as the representative of any of its employees for the purpose of dealing with the respondent concerning grievances, labor disputes, rates of pay, hours of employment, or other conditions of work and completely disestablish Consolidated Seedsmen's Union, Inc., as such representative; * * *"

On March 10, 1942, the Board petitioned this Court for enforcement of the order.

Respondent has answered, and, by our leave, Consolidated Seedsmen's Union, Inc., a labor organization, hereafter called the union, has intervened. Respondent and the union pray that the order be set aside on the ground that the findings are not supported by evidence.

The Board found that respondent had dominated and interfered with the formation and administration of the union, had contributed support to it, and thus had engaged in unfair labor practices within the meaning of § 8(2) of the Act,[2] 29 U.S.C.A. § 158(2); that, by dominating and interfering with the formation and administration of the union, by contributing support to it, and by other acts described in the findings, respondent had interfered with, restrained and coerced its employees in the exercise of rights guaranteed in § 7 of the Act, and thus had engaged in unfair labor practices within the meaning of § 8(1) of the Act,[3] 29 U.S.C.A. § 158(1); and that respondent had recognized the union as the representative of its employees. The question is whether or not these findings are supported by evidence.

First. Does the evidence support the finding that respondent dominated and interfered with the formation and administration of the union?

The evidence shows that respondent was at all pertinent times engaged in the business of growing seeds and plants and purchasing and selling seeds, plants and other merchandise. It had a warehouse and two stores[4] in Los Angeles, California, and a nursery and a store in Van Nuys, California.[5] It had in its employ William S. Clark, Harold Frauenberger, Dwight V. Gates, Daniel G. Hatfield, Woolcott Hill,

---

[1] Section 7 provides: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection."

[2] Section 8 provides that "It shall be an unfair labor practice for an employer—

"(1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [section 157 of this title].

"(2) To dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it; * * *."

[3] The Board also found that these were unfair labor practices affecting commerce, as defined in the Act. Respondent denies that it engaged in any unfair labor practice, but concedes that, if it did, such practice affected commerce. Its brief states: "Respondent does not question the applicability of the National Labor Relations Act to its operations or the jurisdiction of the Board over respondent."

[4] One of these was called the Main Street store. The other was called the Hill Street store. The Main Street store was closed in 1938 or 1939 and has not since been operated.

[5] Respondent had a warehouse and a store in San Francisco, California, a warehouse in Fresno, California, a store in Salinas, California, a store in Santa Maria, California, and a bulb farm at

Allan Hook, Kenneth Richard Luck, Vivian J. Nesbit, Harry B. Orr, Walter P. Sage, Morris Stearn, Dorothy Turton[6] and many others.[7] Clark, Frauenberger, Gates, Hatfield, Hill, Hook, Luck, Nesbit, Sage and Turton played a large part in the formation and administration of the union. It is pertinent, therefore, to inquire what positions were held by these employees. As to this, the evidence shows:

Clark had charge of the nursery department[8] of respondent's Hill Street store (of which one Marks was manager) until April, 1939, and thereafter had charge of respondent's nursery at Van Nuys.

Frauenberger was a shipping clerk. He worked on the first floor (sometimes called the shipping floor) of the warehouse, under Hill's supervision. He helped load trucks, checked the loads, relayed Hill's orders to the truck drivers, and attended to complaints concerning deliveries which the truck drivers made—or failed to make.

Gates was manager of respondent's warehouse. His office was on the fifth floor of the warehouse. He supervised Hatfield, Hook, Nesbit[9] and many other employees of respondent.

Hatfield was an order filler. He worked on the fifth and sixth floors of the warehouse, under Gates' supervision. He usually had one helper, sometimes two.

Hill was respondent's traffic manager, or (as he was sometimes called) manager of its shipping department. His office was on the first floor of the warehouse. He supervised Frauenberger, Nesbit and many other employees of respondent.

Hook was a seed cleaner. He worked on the sixth floor (sometimes called the milling floor) of the warehouse, under Gates' supervision. He and his helpers, when he had helpers, operated seed cleaning mills. He was the only person regularly employed in that work, but in the busy season he sometimes had as many as 12 helpers.

Luck worked on the third floor of the warehouse, under the supervision of one Pieters.[10] He had charge of the bulb department. In the slack season he was the only person employed in that department. In the busy season he had two or three helpers.

Nesbit was an order filler. He worked on the fourth floor of the warehouse, sometimes under Gates' supervision, sometimes under Hill's supervision. He usually had two or three helpers, never more than four, sometimes only one.

Sage was a purchasing agent—a buyer of merchandise—for one department of respondent's business.[11] However, he appears to have had other duties, one of which was to attend weekly meetings of respondent's officers and managers. Others who attended these weekly meetings were Gates, manager of respondent's warehouse; Hill, respondent's traffic manager; Marks, manager of respondent's Hill Street store; Pieters, who had charge of the third floor of respondent's warehouse; Manfred Meyberg, respondent's president; and W. J. Schoenfeld, respondent's vice president.

Turton was private secretary to Schoenfeld, whose office was on the second floor of the warehouse. Whether she had other duties or not the evidence does not show.

All these employees—Clark, Frauenberger, Gates, Hatfield, Hill, Hook, Luck, Nesbit, Sage and Turton—held positions which were different from and superior to those of ordinary employees. Gates and Hill were managers of respondent's business. They supervised, and had power to hire, discipline and discharge, other employees. Although Frauenberger, Hatfield, Hook, Luck and Nesbit had no power to hire, discipline or discharge, they, too, were supervisory em-

Camarillo, California. This proceeding, however, concerns only the Los Angeles and Van Nuys establishments.

[6] Every employee named or referred to in this opinion was employed in Los Angeles or in Van Nuys. Those employed elsewhere are disregarded, as this proceeding does not relate to them.

[7] On October 31, 1940, there were 136 employees in Los Angeles and 10 in Van Nuys—a total of 146. How many there were at other times the record does not show.

[8] Respondent's business comprised many departments—a bulb department, a milling department, a nursery department, an order filling department, a shipping department, a sundries department, etc.

[9] Nesbit was supervised at times by Gates, at other times by Hill.

[10] Luck testified that Pieters "was in charge of the whole [third] floor."

[11] Sage became purchasing agent in 1933. Theretofore, from 1921 to 1933, he was manager of respondent's warehouse. Prior to 1921 he was manager of respondent's shipping department. Thus the positions held by Gates and Hill in 1937, when the union was formed, had years before been held by Sage.

ployees.[12] Frauenberger supervised the truck drivers to whom he relayed Hill's orders. Hatfield, Hook, Luck and Nesbit supervised their helpers.[13] Though not empowered to discipline or discharge those whom they supervised, Frauenberger, Hatfield, Hook, Luck and Nesbit could recommend such action, with the strong probability that their recommendations would be heeded. Clark had charge of a department, and if (as seems probable) other employees worked in that department, Clark supervised them. Sage had been one of respondent's managers and, at all times here pertinent, was still a member of the small group constituting what the Board called the management—a group which also included Gates and Hill. Turton's position was a confidential one which, as the Board said, "allied her closely with the respondent."

The evidence shows that in August, 1937, respondent's employees were being solicited to join a labor organization affiliated with the American Federation of Labor, hereafter called the A.F.L. In consequence of such solicitation, the subject of labor organizations was being discussed by the employees. Opinions differed as to whether they should join an organization affiliated with the A.F.L., join an organization affiliated with the Congress of Industrial Organizations, hereafter called the C.I.O., form an independent organization, or remain unorganized. The question was discussed at two meetings held at respondent's warehouse in August, 1937. Both meetings were called by Sage. Fifteen or 20 of the employees attended the first meeting. Among those attending were Gates, Hatfield, Hill, Hook, Luck, Nesbit and Sage. Sage presided and was the only speaker. He testified that he said: "Several of you boys have come to me and told me that there were different union organizers coming into the plant, talking to groups, and you have expressed to me a desire to have a union of some kind. Perhaps you would like to have a little independent union of your own."

Sage further testified that "they all [Gates, Hatfield, Hill, Hook, Luck, Nesbit and all others present] agreed at that meeting that that was the thing they would really like to do." He further testified that, "before the meeting was over they [Gates, Hatfield, Hill, Hook, Luck, Nesbit and the others] decided that they would like to have me [Sage] bring someone in to organize them and incorporate them, and asked me if I could suggest someone, some legal man, to do that." One employee who was present at the meeting testified that Sage said the "heads of the Company" (meaning respondent) would prefer a "house" union to an "outside" union. The same witness further testified that Sage said: "We are all one big group, a happy family, and we want to be sure whatever we do is right. Before we go any farther, remember that we all have a job that we want to keep. Let's not do anything to spoil our job at Germain's or to put ourselves into a circumstance so we won't be employed there any more. Mr. Meyberg and Mr. Schoenfeld have plenty of money, and they could close the doors at any time, and it wouldn't make any difference to them."

About 30 employees attended the second meeting. Among those attending were Gates, Hatfield, Hill, Hook, Luck, Nesbit and Sage. Also present, at Sage's request, were J. P. Voorhees, an attorney, and David Stratton, secretary and business agent of an independent labor organization theretofore formed in another industry. Sage presided and introduced Voorhees, who thereupon explained to the employees present how an independent labor organization could be formed, and described the advantages of such an organization. In the course of his remarks, Voorhees was asked whether Gates and Hill had a right to be present. Upon being informed that Gates and Hill were supervisory employees, with power to hire and discharge, Voorhees advised them to leave the meeting. They left immediately and did not return. Voorhees introduced Stratton, who spoke briefly of the success of his organization.

At the second meeting it was suggested that an election be held to determine the wishes of the employees as to joining or forming a labor organization. Accordingly, ballots were printed and distributed to the employees, and on or about September 1, 1937, during working hours, an election

---

[12] The Board, in its findings, aptly described Frauenberger, Hatfield, Hook, Luck and Nesbit as "working foremen with supervisory authority."

[13] The evidence shows that Hatfield, Hook, Luck and Nesbit assigned work to their helpers—which, of course, means that they could determine what, and how much, their helpers must do and thus could make the work of their helpers harder or easier, as they saw fit.

was held in respondent's places of business. There is evidence that Clark, Frauenberger, Hook and Nesbit conducted or assisted in conducting the election. Of 102 ballots cast at the election, 10 were spoiled. Of the 92 remaining ballots, 45 were in favor of forming an independent organization, 33 were in favor of joining an organization affiliated with the A.F.L., 3 were in favor of joining an organization affiliated with the C.I.O., and 11 were in favor of conferring with Meyberg (respondent's president) before forming or joining any organization.

After the election, and prior to September 9, 1937, Clark, Frauenberger, Hook, Luck, Orr, Stearn and Turton signed a preorganization agreement, circulated it among their fellow employees, and obtained the signatures of 98—Hatfield, Nesbit, Sage and 95 others. Thus the preorganization agreement bore, in all, 105 signatures. It read as follows: "We, the undersigned, employees of [respondent], desire to form an independent union, for the purpose of dealing with our employer under the provisions of the National Labor Relations Act, known as the Wagner Act, and we do hereby appoint [Clark, Frauenberger, Hook, Luck, Orr, Stearn and Turton] as a committee to formulate an independent union for us and to represent us with our employer under the provisions of the National Labor Relations Act known as the Wagner Act. Each of the undersigned has [paid] or will pay $1 as initiation fee for membership in the union and 50¢ a month as dues commencing one month after becoming a member."

Pursuant to the preorganization agreement, Clark, Frauenberger, Hook, Luck, Orr, Stearn and Turton, hereafter called incorporators, formed the union—a nonprofit corporation—under title 12 (§§ 593–606) of part 4 of division 1 of the California Civil Code. They formed it by executing articles of incorporation and filing them with the Secretary of State, as provided in §§ 595 and 596 of the Civil Code. The articles were executed on September 9, 1937, and were filed on September 17, 1937. By-laws were adopted by the union on September 20, 1937. The preorganiza-

tion agreement, the articles of incorporation and the by-laws were drawn by Voorhees, the attorney whom Sage had "brought in" at the request of Gates, Hatfield, Hill, Hook, Luck, Nesbit and others who attended the first meeting held in August, 1937.

The union was administered by its officers and directors. Its officers were elected by its directors. Its first directors were its incorporators. All its directors after the first were elected by its members. Its members were its incorporators—Clark, Frauenberger, Hook, Luck, Orr, Stearn and Turton—and those who joined it after its incorporation. Among the latter were Hatfield and Nesbit. Applicants for membership were required to sign the following form of application: "I hereby make application for membership in the [union], and I agree, if accepted as a member, to be bound by the articles of incorporation and by-laws[14] of the union, and at all times to work for the best interests of the union and the members thereof, and I hereby designate the board of directors of the union as my exclusive representatives as to all matters referred to in the National Labor Relations Act."

Clark, Orr and Turton were directors of the union from September 17, 1937, to September 20, 1937. Frauenberger and Stearn were directors from September 17, 1937, to July 1, 1938. Hatfield was a director from September 20, 1937, to July 1, 1938. Hook was a director from September 17, 1937, to September 20, 1937, and from July 1, 1940, until this proceeding was commenced. Luck was a director from September 17, 1937, to January 1, 1939, and from November 7, 1939, to January 1, 1940. Nesbit was a director from July 1, 1938, to July 1, 1939. Frauenberger was president of the union from September 20, 1937, to April 5, 1938. Luck was president from April 5, 1938, to April 4, 1939. Hook was president from April 1, 1941, until this proceeding was commenced. Turton was secretary of the union from September 20, 1937, to June 7, 1938. Luck was secretary from April 4, 1939, to April 2, 1940.

The evidence shows that respondent's employees knew of the positions held by Clark, Frauenberger, Gates, Hatfield,

---

[14] The by-laws provided: "The members of the board of directors, together with whatever officers of the union they may designate, shall constitute the committee of representation and shall be the exclusive representatives of all the employees of [respondent] for the purpose of collective bargaining with [respondent] in respect to rates of pay, wages, hours of employment or other conditions of employment."

Hill, Hook, Luck, Nesbit, Sage and Turton and knew of their activities in connection with the formation and administration of the union. There is no evidence that respondent disapproved or disavowed these activities. The Board concluded and was warranted in concluding, (1) that respondent's employees had just cause to believe that Clark, Frauenberger, Gates, Hatfield, Hill, Hook, Luck, Nesbit, Sage and Turton were acting for and on behalf of respondent, and (2) that respondent was responsible for their activities. Cf. International Association of Machinists v. National Labor Relations Board, 311 U.S. 72, 79–81, 61 S.Ct. 83, 85 L.Ed. 50; H. J. Heinz Co. v. National Labor Relations Board, 311 U.S. 514, 518–521, 61 S.Ct. 320, 85 L.Ed. 309; National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 586–600, 61 S.Ct. 358, 85 L.Ed. 368; National Labor Relations Board v. Pacific Gas & Electric Co., 9 Cir., 118 F.2d 780, 786–788.

It is clear from the evidence that by these activities, for which respondent was responsible, the formation and administration of the union were dominated and interfered with. We therefore conclude that the evidence supports the finding that respondent dominated and interfered with the formation and administration of the union.

Second. Does the evidence support the finding that respondent contributed support to the union?

There is evidence that the union solicited membership and collected dues during working hours on respondent's premises; that notices of union meetings were posted on respondent's time clocks; that the union's secretary used respondent's telephone during working hours to notify the union's directors of meetings to be held by them; that such meetings were held in respondent's warehouse; and that all these activities were known and tacitly consented to by respondent. Thus the evidence supports the finding that respondent contributed support to the union.

Third. Does the evidence support the finding that respondent interfered with, restrained and coerced its employees in the exercise of rights guaranteed in § 7 of the Act?

There is evidence that in August and September, 1937, some of respondent's employees contemplated joining a labor organization affiliated with the A.F.L. and designating it as their representative for the purposes of collective bargaining, but were restrained from so doing by the activities of Clark, Frauenberger, Gates, Hatfield, Hill, Hook, Luck, Nesbit, Sage and Turton, for which respondent was responsible, and were by said activities coerced into joining the union and designating its directors as their representatives for the purposes of collective bargaining. Thus the evidence supports the finding that respondent interfered with, restrained and coerced its employees in the exercise of rights guaranteed in § 7.

Fourth. Does the evidence support the finding that respondent recognized the union as the representative of its employees?

This question must be answered in the negative. The evidence shows that on September 28, 1937, the union advised respondent that a majority of its employees were members of the union, and requested it to recognize the union's directors as the exclusive representatives of all its employees for the purposes of collective bargaining. Respondent complied with the request on October 1, 1937. There is no evidence that the union was ever designated or recognized as the representative of any employee.

The order will be modified by striking therefrom paragraphs 1(b) and 2(a) thereof and, as thus modified, will be enforced.

STEPHENS, Circuit Judge (concurring).

It may be argued with some force that we ought to look through the fact that the Board has ordered respondent to cease and desist from recognizing the Consolidated Seedsmen's Union as the representative of the respondent's employees and look through the fact that the respondent has been ordered to withdraw recognition of this union notwithstanding the fact that the directors and not the union were specifically recognized and authorized to act as the employees' bargaining agent. That after all the directors are the acting agent of the union. But we would be assuming a good deal in doing this. The Board may or may not have intended its order to be so construed.

When we, upon review, decree that a Board order shall be enforced, we must look forward to the possible necessity for affirmative action to compel compliance,

and we should therefore be careful to order enforced only, orders that will support such action.

If the portion of the Board's order here ordered enforced does not, in the Board's judgment, reach far enough, the Board has the power to enter a supplemental order which can easily be drawn to avoid the difficulties pointed out in the main opinion.

DENMAN, Circuit Judge (dissenting in part).

In refusing to decree the Board's order to disestablish the Consolidated Seedsmen's Union, Inc., as follows:

"2. * * *

"(a) Withdraw all recognition from Consolidated Seedsmen's Union, Inc., as the representative of any of its employees for the purpose of dealing with the respondent concerning grievances, labor disputes, rates of pay, hours of employment, or other conditions of work *and completely disestablish Consolidated Seedsmen's Union, Inc., as such representative;*" (Emphasis supplied.) this case seems in square conflict with the decisions of the Supreme Court in H. J. Heinz Co. v. National Labor Relations Board, 311 U.S. 514, 522, 61 S.Ct. 320, 85 L.Ed. 309, and National Labor Relations Board v. Link-Belt Co. 311 U.S. 584, 600, 61 S.Ct. 358, 85 L.Ed. 368, considered infra. These cases were cited by the Board. They are not even considered on the question of disestablishment much less distinguished in the majority opinion.

I dissent from the holding that the National Labor Relations Board is powerless to disestablish a union for which an employer has initiated among its employees the movement for its corporate organization; has furnished the organizing committee which becomes its initial corporate membership and its board of directors; has supplied the lawyer who drafted its corporate documents; has its by-laws so drawn that its directors have the function of collective bargaining for its members; has prepared a membership card creating the board of directors the bargaining agent of its members; has procured the signatures to the cards of a large portion, if not a majority of its employees; and where the employer continues to exercise its dominion over its corporate creation.

That is to say, an employer may create and dominate a union among its employees, which certainly gravely hampers, if it does not prevent, the organization of the independent type of union for whose protection Congress enacted the National Labor Relations legislation, and yet the Board cannot "effectuate the policies" of the Act by exercising the power given it by § 10(c) to order the union's disestablishment.

If this doctrine prevail, we may expect throughout the United States those employers who are recalcitrant to the National Labor Relations Act so to occupy the field of labor organization of their employees by such employer-dominated unions, thereby hamstringing the free labor organization which the Act guarantees.

The majority's reasoning seems to be that, because the employer's lawyer so drafted the union's by-laws and the union's membership cards that the corporation's board of directors became the employee's bargaining agent,—that is the employer bargains with itself,—the corporate entity not being so designated cannot be disestablished.

It seems unreasonable to assume that Congress intended the Board's power to disestablish employer-dominated unions should be frustrated by such sinuous technicalities as those contrived by the employer's attorney in this case.

Among at least five Supreme Court decisions which seem clearly to the contrary are:

"* * * We cannot assume that the employees will be free from improper restraints and will have the complete freedom of choice which the Act contemplates where the effect of the unfair labor practice [of dominating a union] is not completely dissipated [by disestablishment]. The Board not the courts determines under this statutory scheme how the effect of unfair labor practices may be expunged. National Labor Relations Board v. Pennsylvania Greyhound Lines, supra [303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307]; National Labor Relations Board v. Bradford Dyeing Ass'n, 310 U.S. 318, 60 S.Ct. 918, 84 L.Ed. 1226; International Association of Machinists v. National Labor Relations Board, supra [311 U.S. 72, 61 S. Ct. 83, 85 L.Ed. 50]." National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 600, 61 S.Ct. 358, 366, 85 L.Ed. 368.

"* * * Disestablishment is a remedial measure under § 10(c) * * * to be employed by the Board in its discretion to remove the obstacle to the employees' right

of self-organization resulting from the continued or renewed recognition of a union whose organization has been influenced by unfair labor practices. Whether this recognition is such an obstacle is an inference of fact to be drawn by the Board from all the circumstances attending those practices. National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; National Labor Relations Board v. Newport News Shipbuilding & Dry Dock Co., 308 U.S. 241, 250, 60 S.Ct. 203, 208, 84 L.Ed. 219." H. J. Heinz Co. v. National Labor Relations Board, 311 U.S. 514, 522, 61 S.Ct. 320, 323, 85 L.Ed. 309.

Nor am I able to follow the reasoning of Judge Stephens' concurrence which is, in effect, that the Board having found the employer's union of the character above described, we should deny enforcement of the Board's order for its disestablishment and require the Board to disestablish again *if the Board is really serious about it.* And this of an Act which in its § 10(i) seeks the speedy elimination of unfair labor practices!