### NATIONAL LABOR RELATIONS BOARD v. CITIZEN-NEWS CO.

No. 9995.

Circuit Court of Appeals, Ninth Circuit.

April 2, 1943.

Dissenting Opinion April 16, 1943.

See, also, 134 F.2d 962.

Robert B. Watts, Gen. Counsel, Ernest A. Gross, Associate Gen. Counsel, Gerhard P. Van Arkel, Asst. Gen. Counsel, and Joseph B. Robison and Helen F. Humphrey, Attys., N. L. R. B., all of Washington, D. C., and Maurice J. Nicoson, Atty., N. L. R. B., of Los Angeles, Cal., for petitioner.

Willis Sargent, of Los Angeles, Cal., and Harlan G. Palmer, of Hollywood, Cal., for respondent.

John A. Cronin, of Newark, N. J. (Abraham J. Isserman, of Newark, N. J., of counsel; Elliott L. Biskind, of New York City, on the brief), for intervenors, Los Angeles Newspaper Guild and Leonard Lugoff.

Before WILBUR, DENMAN, and MATHEWS, Circuit Judges.

WILBUR, Circuit Judge.

The National Labor Relations Board has petitioned for the enforcement of its order against the Citizen-News Company. Its complaint alleges that the Citizen-News Company of Hollywood, California, is engaged in business affecting interstate commerce and that it "has interfered with the self organization of its employees and with their freedom of choice of representatives for collective bargaining."

Eleven specific acts are alleged to have constituted such interference, and two discharges "and other acts" are alleged to have discriminated in regard to the hire and tenure of employment of its employees and to have discouraged membership in the Los Angeles Newspaper Guild, in violation of § 8(3) and of § 8(1) of the National Labor Relations Act, 29 U.S.C.A. § 158(3) and (1).

The respondent, Citizen-News Company, the employer, claims that seven of the acts of interference charged were expressions of opinion or arguments which the employer had a right to make under its constitutional right to free speech. The statements of the employer found by the Board to be objectionable as an unfair labor practice, are those by Young, Swisher and Sternberg, to which we now refer.

The Board found that "some time after the strike [May and June, 1938], Patricia Killoran, when she sought to explain her failure to cover an assignment, T. Harwood Young, the respondent's business manager, inquired 'How could I believe anything after all the things that you have done?' When asked to whom he referred, Young

replied, 'all of you.' Killoran thereupon accused him of referring to the Guild and Young replied, 'Well, as a matter of fact, I can't talk about those things because I am not allowed to,' and after Killoran replied, 'Well, I can talk about them,' Young added that 'his brother had been a very active union man, that he knew more about unions than I would ever know, and he knew about good unions, like the Brotherhood, but that I was just not to be trusted, after the things that we had done.'

"Killoran also testified that at a time when she was posting a notice on the Guild bulletin board, she was told by Swisher that 'the Guild was not a reputable organization,' and that soon after her participation in the strike, Herbert Sternberg, classified-advertising manager, told her, in substance, 'what a fool I was, and what a monkey I made of myself, and how terrible the C. I. O. was and the Guild was and the strikers were.' Killoran's testimony as to the remarks of Young, Swisher, and Sternberg was uncontradicted and we find it to be true, as did the Trial Examiner."

The finding of the Board on the question of foregoing opinion and arguments by the employer are as follows: "By the statements of Young, Swisher and Sternberg, and by its action in depriving the strikers of their bylines, the respondent has interfered with, restrained and coerced its employees in the exercise of the rights guaranteed in Section 7 of the Act [29 U.S.C.A. § 157]."

This decision that the statements above quoted ipso facto "interfered with, restrained and coerced its employees" was rendered by the Board July 16, 1941, prior to the decision of the Supreme Court, December 22, 1941, in the case of National Labor Relations Board v. Virginia Electric & Power Co., 314 U.S. 469, 62 S.Ct. 344, 86 L.Ed. 348.

The Board, at the time of its decision herein, had held in the case of the Virginia Electric and Power Company that advancement of arguments against a labor union or the expression of unfavorable opinion concerning it, or advising the employees against joining, was per se an unfair labor practice, and its above finding was evidently made on that basis.

The Supreme Court, however, in the case of N. L. R. B. v. Virginia, etc., supra, affirmed the right of an employer to freely express his opinion to his em-

ployees as one guaranteed to him by the Constitution. The Supreme Court held that the employer had a right to make statements for the express purpose of preventing the employees from joining a particular union so long as the employer did not threaten or take action to prevent or coerce its employees in the exercise of their rights under the National Labor Relations Act. We have in this case the same situation that was considered by the Supreme Court in the Virginia case, namely, a finding by the Board that by certain specific statements of the employer it had been guilty of coercion.

We have nothing more in the finding above quoted except as to bylines, which we will presently consider. Furthermore, it is worthy of note that at the time the statements were made the employees of the respondent were already organized, had negotiated a contract in May 1938, had struck May 13, 1938, and had negotiated and signed a contract settling the strike and fixing the terms of employment. In what way can it be said that the above expressions of opinion coerced or tended to coerce the employee?

It is true that in the proclamation and notice condemned by the Board in the Virginia case there was a statement by the employer of a hands-off policy. The Supreme Court did not base its conclusion upon that fact. Moreover, the case at bar is replete with the employer's statements that it did not intend to interfere.[1]

The subject of bylines, which appears in this same finding, requires further consideration not only because it is thrown into the above finding as a make-weight but also because the Board ordered that the employer "restore to the strikers the bylines of which they were deprived following the strike in May, 1938." The findings supporting this order are as follows:

"Immediately after the editorial employees returned to work, however, they were deprived of their bylines because in the words of Swisher, the city editor, 'the ill will created during the strike made it difficult for readers, particularly advertisers, to see the names of various former strikers without becoming alarmed at the name, recalling old feelings from the strike.' We find that the strikers were deprived of their bylines because of their participation in the strike."

The Board, it will be observed, accepts the statement of Swisher (as testified to by Roger Johnson) as to the purpose of respondent in doing away with bylines, namely, that it would antagonize the respondent's advertisers. The finding that the strikers were deprived of their bylines because of their participation in the strike is evidently based upon the proposition that the strike resulted in the determination to do away with bylines. It is not found nor contended that the action was intended to punish the strikers. This is manifest by a consideration of the evidence on the subject of bylines shown in the margin.[2]

Under the heading "V. The remedy", the Board states: "We have found that

---

[1] "Hollywood Citizen-News, 1545 North Wilcox Avenue, Hollywood, California, Hollywood 1234. November 3, 1939, Notice. The management has not indicated and will not indicate that it favors any particular course of action on the part of its employees toward joining or not joining a union."

In a copy of "Office Gossip" under date of April 1, 1940, appeared the following "Notice":

"The management has always recognized and will continue to recognize the right of its employees to join or not to join a union."

[2] "How about prior to the strike, had the people used by-lines on their stories, some of them? A. Yes.

"Q. What is the importance of a by-line in the newspaper profession? A. Well, it is a cheap way for the publisher to pay you with honor instead of money.

"Q. Mr. Johnson, is there any importance attached to the by-line on the part of a newspaper man? A. Yes, it is a part of the professional pride of a newspaper man to have his name on a story. It indicates authorship and ownership.

"Q. After the strike were by-lines given to the people who had been out on strike? A. No, not immediately after.

"Q. After the strike, right after, was there anything with respect to that? Was the by-line eliminated for those people? A. Yes, it was, it was eliminated.

"Q. Who explained that? Mr. Swisher or Mr. Palmer? A. Well, I recall Mr. Swisher's explanation that the ill-will created during the strike made it difficult for readers, particularly advertisers, to see the name of various former strikers without becoming alarmed at the name, recalling old feelings from the strike."

the respondent discriminatorily deprived the strikers of their bylines after the strike. It is not clear from the record whether or not the respondent has restored their bylines to the strikers. We shall order the respondent to restore their bylines to these employees in the event that it has not already done so."

■ At the time of the order with reference to the bylines all of the editorial employees were members of the Guild and had been for months prior thereto. There was, therefore, no discrimination against Guild members in the deprivation of bylines for all the members of the Guild were treated alike and there were no other employees in that department.[3] There is no reason to doubt that the temporary deprivation of bylines was made in good faith to accomplish a business result entirely unobjectionable so far as the purpose of the Labor Act is concerned.

In considering whether or not this court should order bylines restored several factors should be noted. First, they had been restored long before the proceedings were instituted before the Board. Second, the issue of bylines was dealt with by the contract dated July 31, 1940.[4] Third, the complaint did not charge discrimination or coercion by reason of depriving the editorial writers of the right to use bylines. Fourth, the findings of the examiner do not deal with the subject of bylines. Consequently, exceptions thereto did not raise the question.

In the absence of such issue and apparently without notice to the employer the Board made its finding and order in regard to bylines. No evidence was introduced by the employer in regard to that subject and the only explanation is that derived from the testimony of Roger C. Johnson, called by the Board, concerning the above explanation made by Mr. Swisher.

The Board found in favor of the respondent on certain allegations of the complaint and these findings dispose of these charges so they need only be mentioned.

The Board found there was no discrimination or unfair labor practice shown by onerous working conditions imposed upon discharged Guild members who were re-employed temporarily pending determination by the Board of the legality of their discharge, or by the subsequent re-discharge of Karl Schlichter, one of those employees.

### Discharge of Leonard Lugoff.

The findings of fact of the Board contain the following:

"Under the circumstances we are impelled to the conclusion, as was the Trial Examiner, that Lugoff was discharged not because of the reasons advanced by the respondent but because of his activities in behalf of the Guild.

"We find that the respondent, by discharging Leonard Lugoff on March 30, 1940, discriminated in regard to his hire and tenure of employment, thereby discouraging membership in the Guild and interfering with, restraining, and coercing its employees in the exercise of the rights guaranteed in Section 7 of the Act."

■ In considering this question it should be emphasized that the right to terminate a contract of employment is a constitutional right of the utmost importance. The mere discharge of an employee with or without reason is therefore not evidence of intent to affect labor unions or the rights of employees under the National Labor Relations Act. That there must be more than mere discharge is clearly recognized by the Board in its findings concerning the discharge of Lugoff. We merely quoted the conclusions at which the Board arrived. The conclusion is preceded by a discussion of the evidence and an argument based thereon occupies thirteen pages of the findings. The argument contained in the findings is based upon the proposition that Lugoff, shortly before his discharge, circulated a petition for the inclusion in the Guild of employees in the classified advertising department. It should be stated that no other employee was discharged because of the petition although it was

---

[3] The Board, on a similar matter, held there was no discrimination.

[4] In the contract of January 31, 1940, it is provided: "5. The publisher agrees that no employee shall be required to have published under his own name any mate-

rial containing an expression of opinion not in conformity with his own opinions, nor shall the by-line of any employee be used without his consent."

The same provision is contained in the contract dated July 31, 1940.

prepared by another employee who was very active in the union. We find no substantial evidence of discrimination in the discharge of Lugoff. Circumstances that merely raise a suspicion that an employer may be activated by unlawful motives are not sufficiently substantial to support a finding.

■ The fact that a discharged employee may be engaged in labor union activities at the time of his discharge, taken alone, is no evidence at all of a discharge as the result of such activities. There must be more than this to constitute substantial evidence.

The employer advanced as the reason for the discharge that Lugoff was an inefficient employee. He had been in the employ of the company since September 1932. He had been discharged for low production in his department in August 1938. This was after the respondent had entered into a contract with the Guild settling the strike, June 30, 1938.

Lugoff did not go out on the strike. For that reason he was expelled from the Guild. In seeking reemployment by the respondent Lugoff contended that he should not be worse off than the strikers who had been restored to employment. He was reemployed and was furnished a written statement dated August 22, 1938, stating, "You will be retained in the present position with final decision to be made on January 1, 1939. The intervening period will be probationary."

In view of the fact that Lugoff was not discharged until May 30, 1940, the Board contends that the claim of respondent that his discharge was pursuant to the agreement under which he was reinstated must be rejected. Even if this be true it does not establish the cause of discharge or justify a finding of unfair labor practice.

Inasmuch as we hold there is no substantial evidence to support any of the claims of unfair labor practice, it follows that the conduct of the respondent cannot be held to have affecteed interstate commerce within the meaning of the National Labor Relations Act.

Order set aside.

DENMAN, Circuit Judge.

I dissent for reasons stated in my dissenting opinion.

DENMAN, Circuit Judge (dissenting).

As stated in my dissent to another Board proceeding against the respondent, if the majority opinion's holdings, hereafter discussed, are to prevail in this circuit, there will have to be employed a new technique by counsel defending their employer clients in National Labor Relations cases.

A. The majority decides an important question of federal law in conflict with a decision of the Second Circuit, National Labor Relations Board v. Yale & Towne Mfg. Co., 114 F.2d 376, 377, 379, a case cited to it but ignored in its opinion. That case holds that where the Board's complaint, after specific acts are charged against the employer, also charges "and by these and other acts respondent did interfere with, restrain, and coerce its employees in the exercise of the rights guaranteed by Section 7 of the Act," and no bill of particulars is filed, the Board may hear and determine another unfair labor practice of a like character.

In the instant case, after reciting certain acts of restraint and coercion, the complaint charges, "and by these and other acts, Respondent did interfere with, restrain, and coerce its employees in the exercise of the rights guaranteed in Section 7 of the Act, and thereby did engage in and is engaging in unfair labor practices within the meaning of Section 8, subsection (1) of the Act."

Section 8(1), 29 U.S.C.A. § 158(1), defines it to be "an unfair labor practice for an employer—(1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in Section 7 * * *."

The respondent here made no motion for a bill of particulars of these "other acts" of restraint or coercion. Nor did respondent move the Board for a rehearing on the ground of surprise.

I therefore dissent from the holding that it is a "factor" to be considered in reviewing the Board's order to restore the bylines, that "the complaint did not charge discrimination or coercion by reason of depriving the editorial writers of the right to use bylines. Fourth, the findings of the examiner do not deal with the subject of bylines. Consequently, exceptions thereto did not raise the question. In the absence of such issue and apparently without notice to the employer the Board made its finding and order in regard to bylines."

I also dissent from the failure of the majority opinion to consider the Second Circuit case so cited above.

B. The majority decides another important point of federal law in conflict with the decision of the Supreme Court in Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 217, 230, 59 S.Ct. 206, 83 L.Ed. 126, in holding it pertinent that the Board orders an employer to desist from committing unfair acts on evidence of such acts in the past and not existing when the accusing union files its complaint with the Board.

The majority opinion states that "In considering whether or not this court should order bylines restored several factors should be noted.· First, they had been restored long before the proceedings were instituted before the Board."

It is not a factor to be noted in determining the justification for the Board's order that the wrong done by the deprivation of the bylines had ceased before the proceedings were instituted before the Board. Consolidated Edison Co. v. National Labor Relations Board, supra, 305 U.S. at pages 217, 225, 59 S.Ct. 206, 83 L.Ed. 126. I dissent for the reasons discussed in my dissent to a similar decision of the majority in the proceeding against the petitioner, National Labor Relations Board v. Citizen-News Co., No. 9994, 9 Cir., 134 F.2d 962, filed April 8, 1943.

C. The majority decides an important federal question in conflict with the decisions of the Supreme Court. It rejects pertinent testimony as not substantial, and substitutes its inferences for equally if not more rational inferences of the Board supporting its findings of "Interference, restraint and coercion."

The decisions so in conflict are National Labor Relations Board v. Pacific Greyhound Lines, 1937, 303 U.S. 261, 271, 58 S.Ct. 571, 576, 82 L.Ed. 838, in which, in holding that continued recognition of a company union would be an obstacle to the exercise of the employees' rights the Court said, "The inferences to be drawn were for the Board and not the courts," and National Labor Relations Board v. Link-Belt Co., 1940, 311 U.S. 584, 597, 61 S.Ct. 358, 365, 85 L.Ed. 368, where the Court reversed the circuit court's refusal to enforce an order, saying, "We are of the opinion that the Court of Appeals in reaching that conclusion substituted its judgment on disputed facts for the Board's judgment—a power which has been denied it by the Congress." See also National Labor Relations Board v. Waterman S. S. Co., 1939, 309 U.S. 206, 208, 209, 226, 60 S.Ct. 493, 84 L.Ed. 704.

In the profession of journalism, the editorial writer's right to a byline is the right to have his name appear over or under the published matter he has written. It gives professional recognition of the writer's value in the estimation of the public he addresses. It marks him as having emerged from the anonymity of a mere unknown hack. Nothing could be more coercive or discriminatory against a writer so having established his reputation with the public than to deprive him of the position he has earned in his profession.

It is undisputed that respondent published the editorials of certain of its writers under the authors' names and that after a strike in which they joined they were deprived of that right.

The Board held, under the title "Interference, restraint, and coercion," that:

"Immediately after the editorial employees returned to work, however, they were deprived of their bylines because in the words of Swisher, the city editor, 'the ill will created during the strike made it difficult for readers, particularly advertisers, to see the names of various former strikers without becoming alarmed at the name, recalling old feelings from the strike.' We find that the strikers were deprived of their bylines because of their participation in the strike.

\* \* \* \* \* \*

"We find that by \* \* \* its action in depriving the strikers of their bylines, the respondent has interfered with, restrained, and coerced its employees in the exercise of the rights guaranteed in Section 7 of the Act."

This is followed by the Board's conclusion of law: "3. By interfering with, restraining, and coercing its employees in the exercise of the rights guaranteed in Section 7 of the Act, the respondent has engaged in and is engaging in unfair labor practices, within the meaning of Section 8 (1) of the Act."

The majority opinion ignores the finding of interference, restraint, and coercion, and proceeds to treat a mere description of these findings, contained in a later portion of the Board's order under the head of "The remedy," where the Board states: "We have

found that the respondent discriminatorily deprived the strikers of their bylines after the strike. It is not clear from the record whether or not the respondent has restored their bylines to the strikers. We shall order the respondent to restore their bylines to these employees in the event that it has not already done so. · * * *"

The majority then discusses the deprivation of the bylines as "discrimination," as if the Board had found the deprivation a discrimination in violation of Section 8(3), instead of restraint and coercion under Section 8(1) of the Act, stating, "At the time of the order with reference to the bylines all of the editorial employees were members of the Guild and had been for months prior thereto. There was, therefore, no discrimination against Guild members in the deprivation of bylines for all the members of the Guild were treated alike and there were no other employees in that department. * * *"

Incidentally, I dissent from this holding [1] that there can be no discrimination under Section 8(3)—that is, no "discrimination in regard to * * * any term or condition of employment" where five out of many employees are so disrated and none of the rest affected as to any term or condition of employment. Nor could I agree that even if the editorial writers were the only employees, they were not discriminated against by such a change in the conditions of their employment. I take it that the phrase in Section 8(3) concerns discrimination against and not discrimination among the employees.

Primarily, I dissent from the majority's refusal to accept the Board's finding that the deprivation of the bylines was a coercive act to restrain the editorial writers from joining in another strike. The evidence on which the majority relies is that one of respondent's employees had stated to another employee that the "ill-will created during the strike made it difficult for readers, particularly advertisers, to see the name of various former strikers without becoming alarmed at the name, recalling old feelings from the strike."

There is no evidence to support this hearsay. On the contrary, the record shows but one advertiser objection to but one writer. Yet, without any substantial evidence to support it, the majority overrules the finding of the Board "that the strikers were deprived of their bylines because of their participation in the strike," and substitutes the court's contrary finding that "There is no reason to doubt that the temporary deprivation of bylines was made in good faith to accomplish a business result entirely unobjectionable so far as the purpose of the Labor Act is concerned."

The attempt to overrule Consolidated Edison Co. v. National Labor Relations Board, supra, and deny a Board order because the unfair labor practice had ceased has been commented upon above. This dissent is further addressed to the statement of the majority opinion, in connection with the claim that the bylines were restored, that "the issue of the bylines was dealt with by the contract dated July 31, 1940," quoting from that contract the following paragraph: "5. The publisher agrees that no employee shall be required to have published under his own name any material containing an expression of opinion not in conformity with his own opinions, nor shall the by-line of any employee be used without his consent."

Here is no agreement to use the writers' bylines, but merely that if the bylines are used they will be used in a certain way.

To summarize my dissent in this and in the companion case, No. 9994, it is that the majority opinions in the two cases show (1) great industry in picking from the record those facts which would lead to a refusal of the Board's prayers for an enforcing decree; (2) the ignoring of testimony, pressed upon it in brief and argument, which would require such enforcement; (3) the substitution of the court's inferences and findings for equally if not more rational inferences and findings of the Board, and (4) the attempt to establish in Labor Relations cases in this circuit principles in direct opposition to the decisions of the Supreme Court, cited to this court and discussed in the two dissenting opinions. Cf. also the dissenting opinion in National Labor Relations Board v. Germain Seed & Plant Co., 9 Cir., 134 F.2d 94, decided February 8, 1943.

---

[1] It is really a mere dictum in view of the finding of coercion.