NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

WINSTON BROTHERS COMPANY and
Green Construction Company d/b/a
Winston & Green, Respondent.

No. 17921.

United States Court of Appeals
Ninth Circuit.

May 1, 1963.

Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Melvin J. Welles, Judith Bleich Kahn, and Allison Brown, Attys., N. L. R. B., Washington, D. C., for appellant.

Thelen, Marrin, Johnson & Bridges, Gordon Johnson and Paul R. Haerle, San Francisco, Cal., for appellee.

Before HAMLIN and MERRILL, Circuit Judges, and BOWEN, District Judge.

HAMLIN, Circuit Judge.

This case is before the court upon the petition of the National Labor Relations Board under section 10(e) of the National Labor Relations Act for enforcement of its order against respondent, a joint venture composed of Winston Brothers Company and Green Construction Company. The Board's order [1] is based upon a finding that respondent violated section 8(a) (1) and (3) of the Act [2] by transferring and ultimately discharging three employees, in response to pressure by their fellow employees, because the three had worked behind a picket line.

During the fall of 1960 and January and February, 1961, respondent was engaged in constructing a tunnel at a location some 65 miles east of Fresno, California. An organization known as the Tunnel and Rock Workers Union of America (TRWA) petitioned the National Labor Relations Board in the fall of 1960 to certify it as bargaining representative of certain employees of the members of Associated General Contractors. Respondent was a member of Associated General Contractors and the petition covered some of its employees. On January 9, 1961, the TRWA struck and picketed respondent's tunneling job. Local 294 of the International Hod Carriers, Building and Common Laborers Union of America, which at the time represented employees of respondent under a collective bargaining agreement, considered the strike "unauthorized" and permitted its members to cross the picket line. During the strike approximately one-half of respondent's workers did cross the picket line and continued to work; among those members of Local 294 who worked on the job during the strike were Turner, Andrus and Fisher.[3]

---

1. The Board ordered respondent to, *inter alia*, cease and desist from discouraging membership in Hod Carriers, Building and Construction Laborers, Local 294, and encouraging membership in Tunnel and Rock Workers of America; and to offer to T. J. Turner, Sidney G. Andrus, and Richard Lee Fisher immediate and full reinstatement to the jobs which each held on January 31, 1961, with payment to each of a sum of money equal to the amount which each would normally have earned as wages from January 31, 1961, to the date of respondent's offer of reinstatement, less his net earnings, during that period.

2. "Sec. 8(a) It shall be an unfair labor practice for an employer—
  "(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7;

    *    *    *    *    *

  "(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization:

    *    *    *    *    *

  "Sec. 7. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a) (3).

3. Fisher had been designated as a "miner" and Turner and Andrus as "chuck

On January 27, after the strike had ended, Turner, Andrus and Fisher returned to the midnight-to-8 a. m. shift ("graveyard shift") on which each had worked prior to the strike. There was no tunnel work on Saturday, January 28, or Sunday, January 29. On Monday, January 30, the work on the day and swing shifts proceeded without incident. Shortly before midnight on January 30, the graveyard shift reported for work. About thirty minutes before the commencement of work, Turner, in order to change into his work clothes went into the change house, where McKenney, Williams, Strope, Fisher and Andrus were getting ready to go to work. An argument then took place between Turner and McKenney. Although there was a conflict in the testimony, the Trial Examiner found that McKenney started the argument; McKenney called Turner a "scab". Epithets were exchanged between them and after a particularly obscene epithet by Turner, McKenney, who was sitting down and, as found by the Trial Examiner, was very drunk, drew a knife. Turner testified that McKenney advanced toward him, holding the knife in one hand and holding up his pants with the other. Turner, who was closer to the door, turned and went over to the door where a broom was resting, picked it up, and thrust the brush end of the broom into McKenney's face. The broom broke and Turner retreated toward the door, picked up his lunch bucket, which was resting on the steps leading to the change room, threw the bucket at McKenney and then ran out of the change room.

Costner, respondent's general superintendent, and Hostetter, the general foreman, arrived on the scene. After being informed that McKenney had been drunk and had drawn a knife, Hostetter, with no further investigation, immedi-

ately discharged McKenney. Some of McKenney's fellow workers later refused to go into the tunnel, stating that Turner should also be fired. After some discussion, Hostetter agreed to go into the tunnel and get Turner out. This was done and the miners went back into the tunnel. Turner was temporarily put to work outside on the "dump". After Turner had been working on the dump awhile, his ankle started hurting, apparently from twisting it during the altercation with McKenney. Turner reported to the first aid officer who bandaged his ankle and gave him a slip to take to his family doctor. Turner did not return to his work on the "dump" and remained under his doctor's care until February 6.

On February 7, Hostetter and several management officials met with five or six workers at the jobsite to discuss whether Andrus and Fisher (both of whom had been transferred to the "sand pile" to work on January 31) could return to their regular work. It was agreed that Andrus and Fisher would return to their regular work that evening. After this had been settled, one of the workers brought up the question as to what would be done about Turner. The workers then took the position that Turner was as much to blame as McKenney for the January 30 fight and that in fairness he also should be fired; apparently no one dissented to the charges that Turner was also responsible for the fight. Project manager Tripp, who had not been present when Hostetter fired McKenney, concluded that the workers' position was a reasonable one and that Turner should be discharged for his part in the January 30 dispute.[4] A termination slip was drawn on February 9 for Turner, and Turner was discharged.

The Board found "that Turner was transferred by respondent from his chuck

---

tenders" under job classifications included in the collective bargaining agreement then in effect between respondent and the Laborers Union. During the strike (when there was only a day shift as contrasted with the normal three shifts that had been worked prior to the strike),

Turner worked as a chuck tender and Andrus and Fisher worked as miners.

4. Hostetter admitted to Tripp that he (Hostetter) had made a mistake in not discharging Turner at the same time he discharged McKenney.

tender job to the dump pile, laid off, and subsequently discharged because of the unlawful pressure brought upon respondent by the Tunnel Workers," and found further "that the aforesaid transfer, layoff, and discharge of Turner were violative of section 8(a) (3) of the Act." We hold that there is not substantial evidence in the record to support these findings. Turner himself admitted that it had never been indicated to him that the miners didn't want to work with him because he had worked during the strike called by the Tunnel Workers;[5] nor is there any substantial evidence in the record to indicate that this was the reason for his transfer and ultimate discharge.[6] While it may be that the argument between Turner and McKenney was initially started because of McKenney's feelings concerning Turner's union activities, the only conclusion supported by substantial evidence in the record is that the other employees refused to continue working with Turner because it was felt that he was as much to blame as McKenney and in fairness should also be discharged. In other words, as one employee testified, "It takes two to make a fight." The employees agreed that Andrus and Fisher could return to their regular work despite the fact that they both had worked during the strike (as had many of respondent's employees). Yet they remained adamant in their position that Turner should be discharged. This difference in attitude on the part of the employess could (from the evidence

in the record) only stem from their feelings concerning Turner's participation in the fight. The Board's finding would appear to be based on mere suspicion, which, as we have previously held, is not sufficiently substantial to support a finding.[7] We conclude that Turner became *persona non grata* with the other employees because of conduct unrelated to his union activities.[8]

We now turn to a consideration of the Board's order as it relates to Andrus and Fisher, both of whom had worked during the strike. They traveled from Fresno for some 65 miles to the jobsite and back to Fresno in Fisher's car with some others, including Turner.

On the night of January 30, just prior to McKenney's argument with Turner, an argument occurred between Fisher and one Vanee in the change house. Vanee claimed that Fisher, on the previous Friday, had tried to run a car in which Vanee was riding "over the mountain."[9] After making this accusation, Vanee said, "This week I am going to drive my truck and you just try it with me." Vanee invited Fisher "to come outside." Fisher replied that he didn't want any trouble and had been told by the union not to cause any.

On the morning of January 31, at the end of the shift, Hostetter told Andrus and Fisher that they were being transferred to the "sand trap" (located across the valley from the tunnel) on the next shift,[10] the reason for the transfer being

5. Turner made a written complaint under the California Fair Employment Practices Act in which he stated, "Due to the fact that several miners refused to work with a colored person, the company refused to take me back to work, because the miners refused to work with me."

6. Although Turner was transferred to the dump and subsequently discharged, there is no substantial evidence in the record to support the Board's conclusion that he was in fact laid off prior to his discharge.

7. See N.L.R.B. v. Citizens News Co., 134 F.2d 970, 974 (9th Cir. 1943), in which this court stated that "[T]he fact that a discharged employee may be engaged in labor union activities at the time of his

discharge, taken alone, is no evidence at all of a discharge as the result of such activities."

8. Cf., NLRB v. Wytheville Knitting Co., 175 F.2d 238 (3rd Cir. 1949) ; NLRB v. Spiewak, 179 F.2d 695 (3rd Cir. 1950) ; NLRB v. Edinburg Citrus Ass'n, 147 F. 2d 353 (5th Cir. 1945).

9. A collision occurred when the car driven by Fisher and in which Andrus, Turner and others were riding attempted to pass the car in which Vanee was riding. Contradictory claims were made as to which car was at fault.

10. The basic pay of the "sand trap" and tunnel jobs was the same, but a bonus

to keep harmony on the crew.[11] Without notice thereof, neither Andrus nor Fisher went to work the next day and in a telephone conversation between Andrus and Hostetter on that day, Andrus stated that they were not at work because Fisher's car had broken down. When they did not arrive at work the next day either, Project Manager Tripp called Andrus' home and left a message with his wife that he wanted to know when Andrus was coming to work.

No word, however, was heard from either Andrus or Fisher until February 5, when they attended a management-union meeting in Fresno.[12] During that meeting, the union took the position that Andrus and Fisher should be put back to work in the tunnel immediately. The company representatives felt that more time was needed to reconcile the strong feelings that had arisen between the men and no agreement was reached on that day.

On February 7, Tripp called a meeting of the crew at the jobsite, the object of the meeting being to tell the crew that he wanted to bring Andrus and Fisher back to work on the graveyard shift that night. Tripp testified that he told the men to "keep their mouths closed except on items of actual prosecution of work." [13] An agreement was reached that Andrus and Fisher would return to work that evening. After the meeting was over, Tripp telephoned the union headquarters in Fresno and stated that he wanted Andrus and Fisher back that night. He then went to Fresno to see Andrus and Fisher. Tripp testified that he told Andrus and Fisher the same thing that he told the other men, namely, to avoid saying things which would lead to violence. Andrus testified on direct ex-amination that Tripp told them, "That you go there, anything they tell you, you take; anything they say, you do," and that they [Andrus and Fisher] refused to go back to work under those conditions. On cross-examination Andrus admitted that as a chuck tender he was to do as the miners told him and also admitted that Tripp had told them that he would look into it if any of the workers called them names when they went back. Fisher testified that Tripp told them to keep their mouths shut when they went back, "that he had the job going, so that he just wanted it kept quiet, just like it is." Fisher stated that Tripp may have indicated that he would see to it that the other men kept their "noses clean." Both Fisher and Andrus indicated to Tripp that they were concerned over whether it would be safe for them to return to the tunnel, Fisher testifying that he told Tripp that "he [Tripp] couldn't be in the tunnel all the time."

Andrus and Fisher asked Tripp to discharge them so that they could receive unemployment insurance. Tripp declined to discharge them because he stated that he had made an agreement that they would go back to work; he also refused to give them reduction in force slips. Tripp told them that if they chose to quit, that would be their own decision. There was testimony to indicate that Tripp at their request did indicate to Andrus and Fisher that he would support their claims, if made, for unemployment compensation. Neither Andrus nor Fisher returned to work again. They subsequently filed claims for unemployment compensation in which they said that they had quit their employment for safety reasons, indicating that their lives had been in danger.

was paid for work done in the tunnel heading based upon the number of feet of progress during a given week. The board also found that men working in the sand trap received neither shift pay nor travel pay.

11. According to Fisher, Hostetter said they were trouble makers and that he [Fisher] "tried to run Frank off the road."

12. Andrus testified that he did not want to go back to work "until the matter was settled."

13. Hostetter made a plea to the men to "keep their noses clean and behave themselves."

The Board found that respondent, in violation of section 8(a) (1) of the Act, transferred and ultimately constructively discharged Andrus and Fisher in response to unlawful pressure exerted by the Tunnel Workers.

There is not substantial evidence in the record to support the Board's finding that the transfer of Andrus and Fisher was motivated by their union activities. Although apparently animosity arose in this case between some persons who had worked during the strike and some who had not, it would appear that the animosity was the product of the specific incidents previously discussed.[14] About one-half of the entire work force had worked during the strike and yet all of the trouble involved Turner, Andrus, and Fisher. Assuming *arguendo* that the Tunnel Workers of America were responsible for exerting pressure on petitioner, we can only wonder why it singled out only these three men for special treatment. We feel that the petitioner simply was caught in the middle between two sides of a disagreement. An unsafe situation existed; naturally petitioner also wanted to avoid any disruption of work.[15] It reasonably concluded that the two factions should be separated temporarily and then made every effort to get Andrus and Fisher back into the tunnel. To order respondent to cease and desist from discouraging membership in Hod Carriers, Building and Common Laborers, Local 294, and encouraging membership in Tunnel and Rock Workers of America on the evidence in this record would be unrealistic.

The Board's finding that Andrus and Fisher were constructively discharged also is not supported by substantial evidence in the record. There was substantial evidence that both sides were equally admonished to avoid arguments and disputes.[16] Andrus' and Fisher's admissions upon cross-examination as to what was said by Tripp to them and their subsequent written reasons for not returning to work greatly weakened Andrus' testimony on direct examination. We hold that Andrus and Fisher voluntarily quit their employment for the very reasons they gave in their claims for unemployment compensation.

We are convinced that "on the record considered as a whole"[17] the Board's findings of fact as to the claimed unfair labor practices are not supported by substantial evidence.

The petition for enforcement of the Board's order is denied.

14. Williams, who had not crossed the picket line, testified that he did not want Turner to return to work, but "didn't care whether they [Andrus and Fisher] worked or not." This testimony evidences the fact that the animosity was the result of individual differences and not the result of a dispute between the Tunnel Workers of America and Andrus and Fisher.

15. The Board relies on NLRB v. Star Pub. Co., 97 F.2d 465 (9th Cir. 1938), in which this court held that the possibility of disruption of work would not justify discriminatory practices on the part of the employer. In that case, however, Star Publishing Co. made no contention that the transfer there involved was not discriminatory, but sought to justify it solely on the basis of expediency.

16. Andrus and Fisher could not dispute the fact that the other employees had been similarly admonished since they were not present at the February 7 meeting.

17. See Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, at pages 487–488, 71 S.Ct. 456, at pages 463–464, 95 L.Ed. 456 (1951) in which the Supreme Court stated:

"Whether or not it was ever permissible for courts to determine the substantiality of evidence supporting a Labor Board decision merely on the basis of evidence which in and of itself justified it, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn, the new legislation definitely precludes such a theory of review and bars its practice. The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. This is clearly the significance of the requirement in both statutes that courts consider the whole record."