**PACIFIC LEGAL FOUNDATION, a non-profit California corporation, et al., Plaintiffs,**

**v.**

**James G. WATT, In his official capacity as Secretary of the United States Department of the Interior, Defendant,**

**and**

**The Bob Marshall Alliance, The Wilderness Society and The Sierra Club, as Intervening Defendants.**

**MOUNTAIN STATES LEGAL FOUNDATION, A non-profit Colorado corporation, Plaintiff,**

**v.**

**James G. WATT, Secretary of the United States Department of Interior, John R. Block, Secretary of the United States Department of Agriculture, Defendants,**

**and**

**The Bob Marshall Alliance, The Wilderness Society, and The Sierra Club, as Intervening Defendants.**

**Nos. CV–81–141–BLG, CV–81–168–BLG.**

United States District Court,
D. Montana,
Billings Division.

June 3, 1982.

---

## SUPPLEMENTAL MEMORANDUM
## DECISION

JAMESON, District Judge.

The federal defendants filed a motion for clarification and, "in combination or in the alternative", for reconsideration of the judgment entered on January 18, 1982, 529 F.Supp. 982. The congressional *amici* filed a "suggestion" that the cases be dismissed as moot. Plaintiff Mountain States Legal Foundation supports the motion for clarification and reconsideration. Plaintiff Pacific Legal Foundation, the intervening defendants, and congressional *amici* all oppose the motion.[1] In a supplemental memorandum decision filed on March 23, 1982 the court considered the federal defendants' motion and invited further comments from all parties with respect to congressional *amici's* suggestion of mootness. This memorandum decision will replace the decision of March 23, 1982.

### *Significant Developments Since Entry of Judgment*

At the outset it is necessary to note significant developments since the entry of judgment which will bear on the disposition of the motion and suggestion of mootness.

1. In a letter to Senator Malcolm Wallop dated January 22, 1982, four days after the judgment was entered, the Secretary of the Interior announced that he had

> decided to postpone the consideration of the issuance of any leases under the Mineral Leasing Act of 1920, in those designated Wilderness Areas until the end of the current Session of Congress. This postponement will allow the Congress to fully debate the issue and will provide ample opportunities for full disclosure of minerals potential as well as wilderness values of those areas available for leasing pursuant to the Wilderness Act of 1964, without the urgency of lease issuance clouding an already complex issue.

---

1. The position of the various parties and *amici* with respect to both the motion for clarification and the suggestion of mootness will be set forth in the discussion of the motion and suggestion.

2. On January 29, 1982, the Secretary entered an order revoking Public Land Order No. 5952, noting, however, that by complying with the judgment and order of this court, the Secretary did not concede the correctness of the legal conclusion.[2]

3. In a news release on January 29, 1982 the Secretary referred to his letter to Senator Wallop and his order revoking Public Order 5952, stating *inter alia*:

> The Interior Secretary already had promised, in a letter to the House Interior Committee dated November 19, 1981, not to issue leases in any designated wilderness area before June 1, 1982. His letter to Senator Wallop has the effect of extending the moratorium on leasing until the 97th Congress adjourns several months later.
>
> . . . .
>
> At the time he released the letter, Watt disclosed that he is revoking his June 1, 1981 withdrawal of the Bob Marshall, Scapegoat, and Great Bear Wilderness Areas from any mineral leasing, pursuant to an order made final by a Federal District Judge in Montana January 18. Revocation of the Montana withdrawal order will have no early practical impact, Watt said, since all Wilderness Areas are covered by his promise not to consider leasing until Congress adjourns, at the earliest.

4. On January 29, 1982, the United States Court of Appeals for the District of Columbia Circuit entered its opinion in *Consumer Energy Council of America, et al. v. Federal Energy Regulatory Commission, et al*, 673 F.2d 425, holding that the legislative veto provision contained in the Natural Gas Policy Act, 15 U.S.C. § 3342(c) is unconstitutional. The court noted the decision in these cases:

> A federal district court in Montana recently upheld a statute empowering a House committee to declare an "emergency situation" with regard to public lands and to direct the Secretary of the Interior to withdraw the lands from mineral leasing activities. The Court construed the statute merely as leaving to the Secretary the decision on the scope and duration of the withdrawal, however, so as to avoid problems under the separation of powers doctrine. *Pacific Legal Foundation v. Watt*, 529 F.Supp. 982 (D.Mont. 1982).

*Id.*, 673 F.2d at 449, n. 85.

5. On February 21, 1982, in a televised interview with the press, the Secretary of the Interior stated:

> The wilderness is a special area that has been preserved, and the law does provide that you can drill within the wilderness areas. We have not done so. We have not allowed any lease to be issued since the Reagan Administration came into existence that would allow anyone to enter the wilderness for mining or drilling. In fact, this week I will ask the Congress of the United States, on behalf of the President, to quickly adopt new legislation that would prohibit the drilling or mining in the wilderness till the end of the century.
>
> We think these lands are special lands and should be preserved in the natural state. One exception: If there is an urgent national need, the President should then, with the concurrence of the Congress, be allowed to withdraw those few acres that might be needed to meet that national need.

6. Finally, on March 19, 1982, the attorney for House *amici* sent the court a copy of a letter to Secretary Watt, dated March 12, 1982, from the Chairman and Ranking Minority Member of the House Committee on Interior and Insular Affairs which reads:

---

**2.** The order reads in part:

1. Public Land Order No. 5952 of June 1, 1981, which withdrew all of the Federal lands in the Bob Marshall, Scapegoat, and Great Bear Wilderness Areas, as designated by Public Laws 88–577, 92–395, and 95–546 from all forms of disposition under all laws pertaining to mineral leasing and all amendments thereto, is hereby revoked in its entirety. The lands aggregate approximately 1,537,000 acres in Flathead, Lewis and Clark, Missoula, Pondera, Powell and Teton Counties, Montana.

On November 20, 1981, near the end of the first session of the 97th Congress, the House Committee on Interior and Insular Affairs adopted by a vote of 40–1 a resolution calling on you to refrain from issuing mineral leases within units of the National Wilderness Preservation System until June 1, 1982. The Committee's resolution noted that such a deferral of leasing was necessary for the Committee and the Senate Committee on Energy and Natural Resources to study and evaluate the matter of leasing in wilderness areas and to consider appropriate legislation. The Committee's resolution neither invoked nor waived the Committee's formal authority under section 204(e) of the Federal Land Policy and Management Act of 1976, which it had previously invoked for three particular wilderness areas, the Bob Marshall, Scapegoat, and Great Bear Wildernesses, on May 1, 1981.

As the second session of the 97th Congress convened, you announced that the Department of the Interior would postpone consideration of lease issuance in wilderness areas until the end of the session.

As you have noted, your announced policy will preclude leasing in all wilderness areas, including the three Montana areas. To avoid any residual uncertainty, on behalf of the Committee we inform you that our November 20 resolution, coupled with your policy announcements, have satisfied the objective of our May 1, 1981 resolution which may be regarded as effectively superseded.

You have not only made it clear that mineral leasing in wilderness areas should not—and will not—be permitted under your stated policy prohibiting such actions, but also that you will consult with this Committee and its Senate counterpart on any future plans regarding such areas. Your policy will give the Congress an opportunity to fully consider this issue in the dispassionate and deliberate manner which it deserves. Although we do not waive—and we do specifically reserve—the Committee's authority to invoke the provisions of sections 204(e) of FLPMA should the Committee deem it to be necessary and appropriate, we believe that your present policy removes the necessity for reliance on the previous resolutions passed by the Committee on this subject.

### Reconsideration of Judgment and Memorandum Decision

■ The memorandum decision sets forth two possible interpretations of section 204(e) of the Federal Land Policy and Management Act of 1976 (FLPMA), which provides that when "the Secretary *determines*, or when the Committee . . . *notifies* the Secretary that an emergency situation exists . . . , the Secretary . . . shall immediately make a withdrawal" of the affected lands, file notice of the withdrawal with both the House and Senate committees, and within three months furnish the committees with the information required in section 204(c)(2). (Emphasis added.) It was held that section 204(e) did not give the House Committee on Interior and Insular Affairs the power to *direct* the Secretary to withdraw the wilderness areas until January 1, 1984, and that the Committee's May 21, 1981 resolution impermissibly conflicted with the Wilderness Act of 1964. It was held further that the scope and duration of a withdrawal order are within the sound discretion of the Secretary of the Interior, to be exercised in accordance with the goals and procedural requirements of the FLPMA, subject to judicial review; and that the Secretary has the power to revoke, after a reasonable time, a withdrawal made at the request of the House or Senate Committees.[3]

---

**3.** As noted in the memorandum decision, the court was also mindful of the rule of judicial restraint that the court should not pass on questions of constitutionality "unless such adjudication is unavoidable." *New York Transit Authority v. Beazer*, 440 U.S. 568, 582, 99 S.Ct.

1355, 1364, 59 L.Ed.2d 587 (1979). In my opinion the May 21 resolution was not authorized by section 204(e) of the FLPMA; and the withdrawal order pursuant thereto has now been revoked.

On the other hand, it was recognized that if section 204(e) were interpreted to permit a congressional committee, by majority vote, to direct the Secretary to withdraw a wilderness area until January 1, 1984 (in effect amending the Wilderness Act), the statute would be unconstitutional under *Chadha v. Immigration and Naturalization Service*, 634 F.2d 408 (9 Cir. 1981). This conclusion is reinforced by *Consumer Energy, supra.*

The federal defendants argue, *inter alia*, that the court's "construction of section 204(e) is not supported by the statute or its legislative history.... In particular, the statute contains *no* language that discusses the concept of 'scope' or 'duration' or an emergency withdrawal as determined by the Secretary."

Congressional *amici* in their response to this contention call attention to the Department of the Interior's own interpretation of the statute, expressed through its adoption of regulations for section 204(e) withdrawals:

> When the *Secretary determines*, or *when either one of the two Committees* of the Congress that are specified in section 204(e) of the Act (43 U.S.C. 1714(e)) *notifies the Secretary*, that an emergency exists ... the Secretary shall immediately make a withdrawal which shall be *limited in its scope and duration* to the emergency.

46 Fed.Reg. 5794, 5804 (1981) (emphasis supplied) (new regulation to be codified at 43 C.F.R. § 2310.5(a)).

As set forth in the memorandum decision, the court's interpretation is also supported by the manner in which the House Committee has previously exercised its authority under section 204(e), where the chairman of the Committee "urged" or "requested" ac-

tion by the Secretary [4] rather than *directing* not only the withdrawal and production of the required information, but also specifying the duration of the withdrawal.[5]

The motion for reconsideration of the judgment will be denied, subject to clarification as hereinafter set forth.

### Clarification of Judgment

The federal defendants seek clarification of paragraphs (2), (3), and (4) of the judgment.

Paragraph (2) reads:

> The Secretary of the Interior, acting within his discretion, shall determine the scope and duration of the withdrawal of the three wilderness areas.

The federal defendants argue that this is inconsistent with the first paragraph of the judgment directing the Secretary to revoke Public Land Order No. 5952, "because if the Secretary were to revoke the withdrawal as ordered, there would be in existence no withdrawal as to which he *could* establish its 'scope and duration'."

There is some merit in this contention. On the other hand, the insertion of paragraph (2) was due largely to the position taken by the federal defendants (reaffirmed in their response to the suggestion of mootness), i.e., that the Secretary is still subject to the May 21, 1981 resolution. The purpose of paragraph 2 was to make it clear that in any withdrawal made pursuant to the May 21, 1981 resolution (or any subsequent resolution) the Secretary should determine its scope and duration. As noted above, if the May 21, 1981 resolution still has any binding effect, the Secretary could in his discretion determine that no emergency situation exists.

---

**4.** The federal defendants would distinguish these cases on the ground that the Secretary had agreed with the Committee that an emergency existed, whereas here the Secretary "does not believe there is any emergency in the first place." The Secretary did, however, furnish the required information well within the three months' period and could have revoked

the withdrawal order on the basis of his determination that no emergency existed.

**5.** Had the House Committee followed its prior practice in notifying the Secretary of an emergency situation without attempting to determine the scope and duration of the withdrawal order, this complex and protracted litigation might well have been avoided.

It is true, as the federal defendants argue in their reply memorandum, that the parties have placed different interpretations on paragraph (2). Pacific Legal Foundation argues that the "scope and duration determination should be made *before* a withdrawal order is in effect" and that "the Secretary can correct his past improper conduct by making the determination of a 'reasonable' withdrawal." The Sierra Club notes the statement in the memorandum decision that the Committee's authority to require a temporary withdrawal empowered it "to maintain the status quo until both congressional committees receive reports from the Secretary," and argues that the "Secretary must now make a new withdrawal, as required by the Committee resolution, which has an extent and duration which he is to determine." The Bob Marshall Alliance and The Wilderness Society contend that the Secretary "should reinstate the withdrawal and make his own determination as to scope and duration."

Congressional *amici* argue that

The Secretary's new policy of deferring leasing in all wilderness areas provides the same protection for such areas as a withdrawal order would. Since a withdrawal order would simply duplicate that policy, such an order is unnecessary and by his new policy the Secretary has satisfied this part of the judgment.

In view of the developments since the judgment was entered, and particularly the letter of March 12, 1982 to Secretary Watt from the Chairman and Ranking Minority Member of the House Committee, it appears that paragraph (2) of the judgment may properly be deleted.

Paragraph (3) of the judgment reads:

It is assumed that in the further handling of applications for noncompetitive oil and gas leases in these wilderness areas the Secretary will follow the procedures set forth in his letters of November 19, 1981, to the chairmen of the House Committee on Interior and Insular Affairs and the Senate Committee on Energy and Natural Resources, for the handling of oil and gas leases on lands within the nation's congressionally-designated wilderness areas.

The federal defendants seek deletion of this paragraph. Congressional *amici*[6] and The Bob Marshall Alliance and The Wilderness Society have expressly stated that they have no objection to the deletion. No party has expressly opposed the motion for clarification with respect to paragraph (3). I agree that in view of the developments since the entry of judgment, this paragraph should be deleted.

Paragraph (4) of the judgment reads:

This court will retain jurisdiction of these consolidated cases until July 1, 1982.

The developments subsequent to the entry of judgment, as set forth above, clearly support the desirability of including this paragraph.

### Suggestion of Mootness

In their "Suggestion of Mootness", the congressional *amici* contend that these cases should be dismissed as moot since the plaintiffs "no longer face rejection of their lease applications due to section 204(e)." They argue that by reason of the revocation of Public Land Order No. 5952, the "status of plaintiffs' applications will henceforth depend on the general administrative policy of deferring all lease applications in wilderness areas announced by the Secretary."

The federal defendants initially opposed the suggestion of mootness, arguing that "unless congressional *amici* are representing, on behalf of their client the House Committee, that they no longer view the May 21, 1981 resolution that ordered the initial withdrawal has been effectively rescinded and no longer is in operation, this case is not moot."[7] They agreed that if the

---

**6.** Congressional *amici* note that "the Secretary's recent policy of deferring leasing, which he explicitly applies to The Bob Marshall area, renders [paragraph (3)] unnecessary."

**7.** This position of the Secretary was summarized as follows:

The Secretary is still subject to an order that, in the opinion of federal defendants, compels

House Committee formally rescinded the May 21 resolution, the two actions would be moot and the cases could be dismissed.

As noted in the court's memorandum decision of January 18, 1982, at oral argument counsel for the House Committee was "not sure" that the Committee's resolution of November 20, 1981 superseded the May 21 resolution, although it "covered the same subject matter." The court suggested that the problem could be resolved by a resolution to provide expressly that it was applicable to the three wilderness areas in question and superseded the May 21 resolution. The letter from the attorney for House *amici* notes the position of the federal defendants and the court's suggestion and concludes that "The letter from Chairman Udall and Ranking Minority Member Lujan to Secretary Watt resolves the problem addressed by the Court."

In the March 23 memorandum decision, it was noted that the letter of March 12 to Secretary Watt and the letter of March 19 to the court appeared to support a conclusion that the House Committee had rescinded its May 21, 1981, resolution, thereby mooting these cases. Prior to entry of an order of dismissal, however, the parties were given until May 28, 1982, to submit further comments on the suggestion. Comments have been submitted by the federal defendants and intervener The Sierra Club in support of the suggestion of mootness and by plaintiffs Pacific Legal Foundation and Mountain States Legal Foundation in opposition.

The federal defendants have now concluded that the House Committee has rescinded the May 21, 1981 resolution. Since the Secretary has also revoked the June 1 withdrawal, the federal defendants argue that "there is no longer a 'case or controversy' between the parties" and therefore, "this court should vacate its judgment and dismiss the entire action as moot." The Sierra Club concludes that, "In retrospect, this case was a conflict between two branches of government which resolved itself by extrajudicial means," and that the court's intervention proved to be unnecessary.

Both plaintiffs, however, contend that neither the Secretary's obligatory compliance with the court's order nor his new policies moot these cases. They argue further that the informal letter of March 12, 1982, did not rescind the May 21, 1981, Resolution of the House Committee, and that even if the Resolution were rescinded, the continuing controversy over leasing in the areas and the likelihood of future Committee actions would still necessitate continued judicial relief.

In *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979), the Court recognized that the burden of demonstrating mootness "is a heavy one" and that "as a general rule, 'voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot'." (Quoting from *United States v. W. T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953)).[8] Jurisdiction may abate, however, "if the case becomes moot because

---

him to comply with an unconstitutional directive of the House Committee. That he has complied with a portion of this Court's Judgment does not waive his right to ask this Court to reconsider its Judgment. Nor does the Secretary's decision not to issue leases in the wilderness areas until the end of the current term of Congress moot the case. That decision merely extended beyond June of 1982 the arrangement of which the Court had knowledge when it rendered its Judgment. Further, the Secretary's decision does not bar the issuance of leases after the end of the current term of Congress in contrast to the House Committee resolution which

would, if implemented according to its terms, foreclose mineral leasing in the three wilderness areas forever. If this Court's Judgment is appealed and if a higher court reverses this Court, the Secretary could be ordered to implement the House Committee resolution according to its terms. Therefore, a "live" controversy remains and the case is not moot—unless the May 21 resolution is no longer deemed binding on the Secretary.

**8.** In *United States v. W. T. Grant, Inc.*, the Court stated:

A controversy may remain to be settled in such circumstances, *United States v. Alumi-*

(1) it can be said with assurance that "there is no reasonable expectation ..." that the alleged violation will recur, ..., and

(2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation. See, e.g., DeFunis v. Odegaard, 416 U.S. 312 [94 S.Ct. 1704, 40 L.Ed.2d 164] (1974); Indiana Employment Security Div. v. Burney, 409 U.S. 540 [93 S.Ct. 883, 35 L.Ed.2d 62] (1973).

When both conditions are satisfied it may be said that the case is moot because neither party has a legally cognizable interest in the final determination of the underlying questions of fact and law. Id. at 631, 73 S.Ct. at 896.

■ The amici have failed to sustain their burden of meeting these conditions. While the House Committee has informally by letter indicated that it has rescinded the May 21, 1981 Resolution, the letter itself states that the Committee does not waive, but specifically reserves "the Committee's authority to invoke the provisions of section 204(e) of FLPMA should the Committee deem it to be necessary and appropriate." The Secretary's recent policy changes are clearly voluntary. In his order revoking Public Land Order No. 5952 he specifically noted that he did not concede the correctness of this court's prior legal conclusions in these cases.[9] These reservations by the House Committee and Secretary indicate that it cannot "be said with assurance" that the alleged violations will not recur. County of Los Angeles v. Davis, supra, 440 U.S. at 631, 99 S.Ct. at 1383. With a complete dismissal of the actions, the parties would be "free to return to [their] old ways." United States v. W. T. Grant Co., supra, 344

U.S. at 632, 73 S.Ct. at 897. Moreover, there is a "public interest in having the legality of the practices settled...." Id.

In addition, the Supreme Court has recognized a further exception to the principles of mootness where jurisdiction "might be defeated by short term orders, capable of repetition, yet evading review...." Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911), DeFunis v. Odegaard, supra, 416 U.S. at 318–319, 94 S.Ct. at 1706–07; Moore v. Ogilvie, 394 U.S. 814, 816, 89 S.Ct. 1493, 1494, 23 L.Ed.2d 1 (1969). Should the committee or the Secretary decide to reverse or modify their recent decisions or policies, a recurrence of the wilderness area leasing conflict is a distinct possibility. Under the Wilderness Act exploration and leasing of designated wilderness areas must be completed by December 31, 1983. Were this case dismissed as moot and were the conflict to arise again, the plaintiffs would be forced to relitigate in a very short time frame issues already decided in these cases. The time parameters established in the Wilderness Act might render relitigation wholly ineffective.

*Conclusion*

Accordingly, IT IS ORDERED:

(1) The motion of the federal defendants for reconsideration of the judgment is denied.

(2) The motion to clarify the judgment is granted with respect to paragraphs (2) and (3), and those paragraphs are deleted from the judgment.

(3) Congressional amici's suggestion of mootness is rejected.[10]

---

num Co. of America, 148 F.2d 416, 448 (1945), e.g., a dispute over the legality of the challenged practices. (citations omitted). The defendant is free to return to his old ways. This, together with a public interest in having the legality of the practices settled, militates against a mootness conclusion. 345 U.S. at 632, 73 S.Ct. at 897.

**9.** A party's obligatory compliance with a court's decision and order does not negate a

case or controversy. National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 271, 58 S.Ct. 571, 576, 82 L.Ed. 831 (1938).

**10.** On May 27, 1982, plaintiff Pacific Legal Foundation filed a motion for an award of attorney fees and expenses, with supporting memorandum. The court will defer ruling on the motion until responses are filed by the adverse parties.